## SHIRLEY WILLIAMS *v.* KRISTINE D. RAGAGLIA, COMMISSIONER OF CHILDREN AND FAMILIES (SC 16587)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

---

Argued February 11—officially released August 6, 2002

*Stephen G. Vitelli*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellant (defendant).

*Royal J. Stark*, with whom, on the brief, was *Eric V. McGrew*, certified legal intern, for the appellee (plaintiff).

*Opinion*

KATZ, J. The sole issue in this certified appeal is whether the appeal by the plaintiff, Shirley Williams,

from the decision of the defendant, Kristine D. Ragaglia, the commissioner of children and families (commissioner), revoking her special study foster care license was rendered moot when the plaintiff was awarded legal custody of the two children who were the subject of the foster care license. The defendant appeals from the judgment of the Appellate Court, which reversed the trial court's judgment dismissing the plaintiff's appeal on the ground of mootness. We conclude that, because the plaintiff has demonstrated a reasonable possibility that collateral consequences will arise from the revocation of her foster care license, her claim was not rendered moot when she was awarded legal custody of the children. Accordingly, we affirm the judgment of the Appellate Court.

The record contains the following facts and procedural history that are relevant to our resolution of this issue. In 1993, the department of children and families (department) issued a limited special study foster care license (special license)[1] to the plaintiff, specifically to provide care to two minor half siblings, S and K.[2] The

[1] A special study foster care license authorizes the holder to provide foster care only for the children specifically identified in the license. The department typically utilizes the special license when a parent of a child committed to the custody of the department requests that a specific individual, who is not licensed to provide general foster care, provide foster care to his or her child. In the present case, the biological mother of S and K; see footnote 2 of this opinion; whose parental rights ultimately were terminated, had requested that the department place her children with the plaintiff while the mother was in a drug addiction treatment program in July, 1992.

[2] The children are not identified by name in keeping with General Statutes § 46b-142 (b), which provides: "The Department of Children and Families, or any party at interest aggrieved by any final judgment or order of the court, may appeal to the Appellate Court in accordance with the provisions of section 52-263. The clerk in charge of such juvenile matters shall forthwith, after notice of any appeal, prepare and file with the clerk of the Appellate Court the certified copy of the record of the case from which such appeal has been taken. The name of the child or youth involved in any such appeal shall not appear on the record of the appeal, and the records and papers of any juvenile case filed in the Appellate Court shall be open for inspection only to persons having a proper interest therein and upon order of the court."

plaintiff is also the legal guardian of a half sister of S and K, D, and has minor children of her own. In May, 1997, after periodic renewals of the special license, the department sent a letter to the plaintiff citing several foster care regulations and stating that there were sufficient grounds to recommend a revocation of her license.[3] On November 26, 1997, after conducting hearings on the department's recommendation, a hearing officer issued a proposed final decision. In the proposed decision, the hearing officer ruled that, although the plaintiff had violated certain foster care regulations, her special license "[would] be retained, with certain conditions . . . as it would be in the children's best interests to maintain them in this placement despite the licensing violations found."[4]

---

[3] The letter to the plaintiff cited the following department regulations: Regs., Conn. State Agencies § 17a-145-143 (pertaining to health standards for foster parents and household members); Regs., Conn. State Agencies § 17a-145-148 (pertaining to substitute child care when adults in foster home are absent for extended period of time); and Regs., Conn. State Agencies § 17a-145-152 (a) and (d) (pertaining to granting and approving licenses when household member of foster home either has been convicted of certain crimes, has had allegation of child abuse substantiated, has had minor removed from member's care due to abuse or neglect, or has knowingly arranged for substitute care by such person).

After hearings pertaining to these allegations, the department issued a second letter to the plaintiff, which no longer referred to § 17a-145-143 or § 17a-145-152 (a) of the regulations. The letter, however, cited the following additional regulations, which were not cited in the first letter: Regs., Conn. State Agencies § 17a-145-133 (stating general requirements for issuing or approving foster care license); Regs., Conn. State Agencies § 17a-145-144 (listing character standards for foster parents and household members); and Regs., Conn. State Agencies § 17a-145-152 (b) (stating that license renewal may be denied due to criminal status of household members).

[4] The following conditions were set forth in the 1997 proposed decision: (1) that the plaintiff maintain a list of at least three department-approved alternate caregivers; (2) that, within sixty days of the decision, the plaintiff return to work and provide the department with proof of income sufficient to meet the needs of the foster family as required by § 17a-145-147 of the Regulations of Connecticut State Agencies; and (3) that the department be allowed to perform unannounced visits at the plaintiff's home for a period of six months.

After department staff filed an objection to the proposed decision, on June 3, 1998, the commissioner remanded the matter for a further hearing to determine: (1) the extent to which the plaintiff had complied with the conditions of the proposed final decision; (2) the extent to which the plaintiff generally had complied with the department licensing regulations since the conclusion of the previous hearing; and (3) the best interests of S and K. On March 9, 1999, the hearing officer issued a second proposed final decision, finding that the plaintiff's adult daughter, who had been convicted on felony drug charges, was living in the plaintiff's household, and concluding, therefore, that the plaintiff was in violation of the regulations pertaining to limitations on who may be members of the foster household and on the provision of substitute care. The proposed decision upheld the department's May, 1997 recommendation to revoke the plaintiff's special license based upon her noncompliance with licensing regulations. The commissioner adopted the second proposed decision in its entirety on June 21, 1999.

The department then began action to remove S and K from the plaintiff's home. In response, the plaintiff filed a petition for a writ of habeas corpus in the juvenile matters division of the Superior Court seeking legal custody of S and K.[5] Shortly thereafter, the plaintiff filed a contemporaneous administrative appeal in the trial court pursuant to General Statutes § 4-183, seeking a reversal of the decision revoking her special license.[6]

[5] The plaintiff filed the petition pursuant to General Statutes § 52-466 (f), which provides: "A foster parent or an approved adoptive parent shall have standing to make application for a writ of habeas corpus regarding the custody of a child currently or recently in his care for a continuous period of not less than ninety days in the case of a child under three years of age at the time of such application and not less than one hundred eighty days in the case of any other child."

[6] The plaintiff cited numerous grounds for her appeal, challenging both the legal and factual underpinnings of the commissioner's decision.

She also sought a stay of the decision revoking her special license.

While the administrative appeal was pending, the department decided to support the plaintiff's petition for custody and guardianship of S and K. On December 14, 1999, the trial court resolved the petition for the writ of habeas corpus in the plaintiff's favor and transferred legal custody of S and K to her. As the children's legal guardian, the plaintiff no longer needed a special license. See General Statutes § 17a-93 (d) (defining guardianship).[7] As a result, on May 25, 2000, the commissioner filed a motion to dismiss the plaintiff's administrative appeal as moot. On June 27, 2000, after oral argument, the trial court dismissed the plaintiff's administrative appeal as moot.

The plaintiff appealed from the trial court's judgment to the Appellate Court. On appeal, the plaintiff contended that her claim was not moot because: (1) she was then suffering and would continue to suffer harm and adverse consequences as a result of the commissioner's decision to revoke her special license; and (2) the trial court could grant practical relief from this harm by overturning the revocation decision. *Williams* v. *Ragaglia*, 64 Conn. App. 171, 172, 779 A.2d 803 (2001). The Appellate Court agreed with the plaintiff that her claim was not moot. Id., 175. The court noted that, as the biological mother of her own minor children and as the legal guardian of S and K, who previously had been wards of the department, the plaintiff was a mem-

---

[7] General Statutes § 17a-93 (d) provides: " 'Guardianship' means guardianship, unless otherwise specified, of the person of a minor and refers to the obligation of care and control, the right to custody and the duty and authority to make major decisions affecting such minor's welfare, including, but not limited to, consent determinations regarding marriage, enlistment in the armed forces and major medical, psychiatric or surgical treatment . . . ." See also General Statutes § 45a-604 (5) (guardian defined for purposes of guardians of person of minor under Probate Court procedure).

ber of the class that the department is authorized to investigate.[8] Id. The Appellate Court reasoned, therefore, that, if the plaintiff were to come under the department's scrutiny in the future, the department could use the plaintiff's record containing the license revocation against her. Id. It further noted that the trial court could provide practical relief to the plaintiff if it overturned the license revocation, thereby giving the plaintiff a clean record with the department. Id. Accordingly, the Appellate Court concluded that the plaintiff's appeal was not moot, reversed the judgment of the trial court and remanded the case to that court for an adjudication on the merits of the administrative appeal. Id., 175–76. Thereafter, the commissioner petitioned this court for certification to appeal. We granted the commissioner's petition, limited to the following question: "Did the Appellate Court properly conclude that [the] administrative appeal regarding the revocation of the plaintiff's special study foster care license was not moot?" *Williams* v. *Ragaglia*, 258 Conn. 921, 782 A.2d 1254 (2001).

A claim of mootness implicates the well established rule that "[a]n actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.) *Giaimo* v. *New Haven*, 257 Conn. 481, 492–93, 778 A.2d 33 (2001).

The commissioner claims that the Appellate Court improperly determined that the plaintiff's claim was not moot. Specifically, the commissioner contends that,

---

[8] The department's authority to investigate child welfare issues is derived from several statutory provisions. See, e.g., General Statutes § 17a-90 (a) (granting commissioner "general supervision over the welfare of children who require care and protection of the state"); General Statutes § 17a-101g (authorizing department to investigate allegations of child abuse).

once the plaintiff obtained legal custody of S and K, the special license was no longer required for the children's care. Therefore, relief in the form of reinstatement of the special license is now impractical. The commissioner also claims that the Appellate Court improperly expanded our mootness jurisprudence by allowing a speculative injury that might arise from future dealings with the department to satisfy our justiciability requirements.

The commissioner's claim raises an issue that is related to a similar claim raised in another case that we have decided today. See *State* v. *McElveen*, 261 Conn. 198, 802 A.2d 74 (2002). In *McElveen*, we addressed the issue of whether the reasonable possibility for prejudicial collateral consequences stemming from a challenged impropriety can establish the requisite injury necessary for jurisdiction. Id., 205–212. We rejected therein the state's invitation to follow the United States Supreme Court's decision in *Spencer* v. *Kemna*, 523 U.S. 1, 14, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998), which held that actual, necessary collateral consequences were required in order to justify the continuing exercise of jurisdiction under the United States constitution. *State* v. *McElveen*, supra, 209. Instead, we reaffirmed this court's long-standing mootness jurisprudence, namely, that, despite developments during the pendency of an appeal that would otherwise render a claim moot, the court may retain jurisdiction when a litigant shows that "there is a reasonable possibility that prejudicial collateral consequences will occur." Id., 208; see, e.g., *Statewide Grievance Committee* v. *Whitney*, 227 Conn. 829, 837 n.13, 633 A.2d 296 (1993); *Housing Authority* v. *Lamothe*, 225 Conn. 757, 765, 627 A.2d 367 (1993); *State* v. *Smith*, 207 Conn. 152, 161, 540 A.2d 679 (1988); see also *State* v. *Reilly*, 60 Conn. App. 716, 724–25, 760 A.2d 1001 (2000); *Haynes* v. *Bronson*, 13 Conn. App. 708, 711, 539 A.2d 592 (1988).

The commissioner does not contest our doctrine establishing that potential collateral consequences arising from a challenged action defeat a claim of mootness. Rather, the commissioner contends that the record must demonstrate that the plaintiff will or is *likely* to suffer specific, foreseeable collateral consequences stemming from the commissioner's decision to revoke her special license. Essentially, the commissioner contends that the Appellate Court's reasoning that the department *could* use the plaintiff's license revocation to her detriment in future proceedings does not satisfy this standard. In support of this position, the commissioner points out that anyone who has children may come under the scrutiny of the department and that the plaintiff's license revocation, therefore, does not render her specifically vulnerable to department scrutiny. Therefore, the commissioner claims that the plaintiff has failed to establish the likelihood of interacting with the department in the future.

We reject the legal premise upon which the commissioner relies. In *McElveen*, we confirmed that the application of the collateral consequences mootness doctrine is not predicated on a showing of the probability of such consequences, but, rather, on a showing of the *reasonable possibility* of collateral consequences. *State* v. *McElveen*, supra, 261 Conn. 208. Accordingly, this standard requires the plaintiff to demonstrate more than an abstract, purely speculative injury, but does not require the plaintiff to prove that it is more probable than not that the prejudicial consequences will occur.

We recognize, as did the Appellate Court, the reasonable possibility that the department could use the plaintiff's license revocation to her detriment in future proceedings.[9] See *Williams* v. *Ragaglia*, supra, 64 Conn.

[9] The commissioner contends that the department's recommendation to the habeas court that the plaintiff should be appointed as guardian of S and K "clearly belies any contention that any speculative future dealings with the [department] would be negatively influenced by the [special license]

App. 175. The possibility that the plaintiff will have future interaction with the department is not purely speculative. As noted previously, the plaintiff also voluntarily has assumed the care of another child who is not her own, D, the half sister of S and K. Moreover, a fourth child, E, who shares the same mother as D, S and K, also resided with the plaintiff at one time. Of these four children, the only blood relation to the plaintiff is D, who is the plaintiff's niece through her brother. In light of the plaintiff's voluntary assumption of the care of these four children, there is *at least* a reasonable possibility that the plaintiff will be asked again to assume the role of foster parent either by her brother or by the children's mother, who has a history of drug addiction and who repeatedly has turned to the plaintiff for help.[10] Accordingly, the plaintiff would have occasion to interact with the department, at which time it could consider, among other factors, the plaintiff's license revocation due to regulation infractions. Cf. *Housing Authority* v. *Lamothe*, supra, 225 Conn. 765 (plaintiff's consideration of defendant's eviction as one of many factors in deciding whether to rent to defendant in future is cognizable collateral consequence). Surely, if this court has taken into account the reasonable possibility of criminal recidivism when addressing the collateral consequences attending parole violations; see *State*

revocation." We note, however, that if the commissioner has no intention of ever using the record to the plaintiff's detriment, the commissioner easily could have resolved this matter at any stage in the proceedings, throughout this lengthy appellate process, by vacating the revocation decision voluntarily.

[10] S and K were placed with the plaintiff in July, 1992, when their mother signed a voluntary placement agreement while hospitalized for drug addiction treatment. At the trial court proceeding terminating the mother's parental rights, the trial court noted that the mother had an "ongoing substance abuse problem and history of failed treatments." Accordingly, it is not only reasonably possible that the plaintiff will seek to become a foster parent in the future, but, more specifically, that the plaintiff may be called upon to assume the care of any future children of the mother of D, E, S and K.

v. *Smith*, supra, 207 Conn. 161; and of repetitive rule infractions by attorneys; see *Statewide Grievance Committee* v. *Whitney*, supra, 227 Conn. 837–38 n.13; we likewise must consider the reasonable possibility that a person, such as the plaintiff, who has agreed selflessly to become a foster parent to children not her own, will again in the future become a foster parent and have occasion to interact with the department.

We further note that the reasonable possibility of adverse use of the plaintiff's record is not limited to proceedings with the department. The department is mandated statutorily to disclose its records to numerous government agencies upon request without obtaining the consent of the person who is the subject of the record. See General Statutes (Rev. to 2001) § 17a-28 (f), as amended by No. 01-142, § 1, of the 2001 Public Acts.[11] There are a variety of ways in which the record

[11] General Statutes (Rev. to 2001) § 17a-28 (f), as amended by No. 01-142, § 1, of the 2001 Public Acts, provides: "The commissioner or the commissioner's designee shall, upon request, promptly provide copies of records, without the consent of a person, to (1) a law enforcement agency, (2) the Chief State's Attorney or the Chief State's Attorney's designee or a state's attorney for the judicial district in which the child resides or in which the alleged abuse or neglect occurred or the state's attorney's designee, for purposes of investigating or prosecuting an allegation of child abuse or neglect, (3) the attorney appointed to represent a child in any court in litigation affecting the best interests of the child, (4) a guardian ad litem appointed to represent a child in any court in litigation affecting the best interests of the child, (5) the Department of Public Health, which licenses any person to care for children for the purposes of determining suitability of such person for licensure, (6) any state agency which licenses such person to educate or care for children pursuant to section 10-145b or 17a-101j, (7) the Governor, when requested in writing, in the course of the Governor's official functions or the Legislative Program Review and Investigations Committee, the committee of the General Assembly on judiciary and the committee of the General Assembly having cognizance of matters involving children when requested in the course of such committees' official functions in writing, and upon a majority vote of said committee, provided no names or other identifying information shall be disclosed unless it is essential to the legislative or gubernatorial purpose, (8) a local or regional board of education, provided the records are limited to educational records created or obtained by the state or Connecticut-Unified School District #2, established pursuant

pertaining to the plaintiff's license revocation could be used to her detriment.[12] The commissioner does not

to section 17a-37, and (9) a party in a custody proceeding under section 17a-112, or section 46b-129, as amended by this act, in the Superior Court where such records concern a child who is the subject of the proceeding or the parent of such child. A disclosure under this section shall be made of any part of a record, whether or not created by the department, provided no confidential record of the Superior Court shall be disclosed other than the petition and any affidavits filed therewith in the superior court for juvenile matters, except upon an order of a judge of the Superior Court for good cause shown. The commissioner shall also disclose the name of any individual who cooperates with an investigation of a report of child abuse or neglect to such law enforcement agency or state's attorney for purposes of investigating or prosecuting an allegation of child abuse or neglect. The commissioner or the commissioner's designee shall, upon request, promptly provide copies of records, without the consent of the person, to (A) the Department of Public Health for the purpose of determining the suitability of a person to care for children in a facility licensed under sections 19a-77 to 19a-80, inclusive, 19a-82 to 19a-87, inclusive, and 19a-87b, and (B) the Department of Social Services for determining the suitability of a person for any payment from the department for providing child care."

The preceding language is the current codification of § 17a-28 (f). Hereinafter, references to § 17a-28 (f) are to the 2001 revision, as amended by Public Act 01-142.

[12] For example, if an allegation of child abuse were to be made against the plaintiff, it is foreseeable that law enforcement officers or the state's attorney's office would request disclosure of the plaintiff's record from the department. See General Statutes § 17a-28 (f) (1) and (2). It does not stretch the imagination to assume that even an unsubstantiated allegation would be treated more seriously based on the plaintiff's record of having had her foster care license revoked for cause. In addition, if the plaintiff were to seek future employment in the child care or childhood education field, the record could impact her ability to become licensed or to become eligible for government payment for providing child care services. See General Statutes § 17a-28 (f) (5) and (6).

The commissioner contends that we should not consider the potential collateral consequences of disclosure under § 17a-28 (f) because the plaintiff did not raise this claim in the trial court. As the commissioner correctly points out, this court generally does not address a theory that was not raised before the trial court. *Mellon* v. *Century Cable Management Corp.*, 247 Conn. 790, 799, 725 A.2d 943 (1999) (party "may not try its case on one theory and appeal on another"). We note, however, an important distinction in the present case. The plaintiff has not asserted a new legal theory but, instead, has offered yet another example of how the license revocation could be used to her detriment to support the theory she already had raised in the trial court.

assert that there is not a reasonable possibility that the plaintiff's record would be disclosed pursuant to the statute and that adverse consequences reasonably could attend such a disclosure. Instead, the commissioner contends that the plaintiff's interests are protected adequately against harmful disclosure by virtue of a regulation that permits the plaintiff to contest any alleged inaccuracies in personal data contained in the department's records. See Regs., Conn. State Agencies § 17-415 (g)-11 (a). We reject these measures as adequate protection for the plaintiff here because the department has discretion whether to make a change to an individual's record and an aggrieved party's recourse upon the department's refusal to delete the contested material is to submit a statement that will be included when the record is disclosed. Regs., Conn. State Agencies § 17-415 (g)-11 (c).

Finally, we note that the dissemination of the plaintiff's record to various government agencies pursuant to § 17a-28 (f), albeit not a direct dissemination to the public, would taint the plaintiff's reputation. The revocation of a foster care license for cause stigmatizes the plaintiff as having been found to be an unfit caregiver. Cf. *Winegar* v. *Des Moines Independent Community School District*, 20 F.3d 895, 899 (8th Cir.), cert. denied, 513 U.S. 964, 115 S. Ct. 426, 130 L. Ed. 2d 340 (1994) (unjustified allegation of child abuse carries stigma); *Valmonte* v. *Bane*, 18 F.3d 992, 1000 (2d Cir. 1994) (inclusion on list of child abusers attaches stigma even though disclosure not to public generally but only to authorized state agencies and potential employers in child care field). Moreover, unlike some statutes that impose confidentiality requirements on the disclosure of records; see General Statutes § 19a-583 (barring disclosure of confidential human immunodeficiency virus [HIV] information); General Statutes § 46b-124 (a) (providing that juvenile proceedings are confidential and

sealed); there is no such bar on the disclosure of records obtained by an agency pursuant to § 17a-28 (f). Therefore, the information ultimately could enter the public domain and further stigmatize the plaintiff. Cf. *Hodge* v. *Jones*, 31 F.3d 157, 165 (4th Cir.), cert. denied, 513 U.S. 1018, 115 S. Ct. 581, 130 L. Ed. 2d 496 (1994) (extensive confidentiality requirements under state law preclude stigma of label of child abuser from attaching to investigative report); *Tracy* v. *Johnson*, 156 Conn. 630, 632, 239 A.2d 477 (1968) (availability of Juvenile Court records only upon order of court mitigates against stigma from juvenile commitment record).

Courts have long recognized the importance of being able to maintain one's own good name.[13] "[T]he individual's right to the protection of his own good name reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." (Internal quotation marks omitted.) *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 341, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974); see also *Wisconsin* v. *Constantineau*, 400 U.S. 433, 437, 91 S. Ct. 507, 27 L. Ed. 2d 515 (1971) (emphasizing importance of "a person's good name, reputation, honor, or integrity"); *In re Ames Dept. Stores, Inc.*, 76 F.3d 66, 69 (2d Cir. 1996), quoting W. Shakespeare, Othello, act 3, sc. 3 (" '[W]ho steals my purse steals trash . . . . But he that filches from me my good name . . . makes me poor indeed.' "). Indeed, the citizens of this state have placed such value on one's interest in his or her reputation as to afford it constitutional protection. See Conn. Const., art. I, § 10 ("[a]ll courts shall be open, and every person, for an

---

[13] "While an individual may not have a 'property' or 'liberty' interest in his or her reputation so as to trigger due process protections, *Paul* v. *Davis*, 424 U.S. 693, 712 [96 S. Ct. 1155, 47 L. Ed. 2d 405] (1976), that question is obviously distinct from whether an interest in one's reputation is sufficient to defeat a claim of mootness." *Spencer* v. *Kemna*, supra, 523 U.S. 24 n.4 (Stevens, J., dissenting).

injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay"). In recognition of the importance of one's good name, this court has determined, when addressing collateral consequences, that an action that stains one's reputation is an injury that the court can consider in determining whether it may grant practical relief. See *State* v. *Whitney*, supra, 227 Conn. 837–38 n.13 ("collateral consequences for attorney's reputation and standing" render case not moot);[14] *State* v. *Smith*, supra, 207 Conn. 161 (defendant's probation revocation may "affect his standing in the community in its connotation of wrongdoing"); see also *State* v. *Collic*, 55 Conn. App. 196, 201, 738 A.2d 1133 (1999) (removal of probation violation from defendant's record would delete "mark that would otherwise . . . affect his reputation in the community"); *State* v. *Johnson*, 11 Conn. App. 251, 256, 527 A.2d 250 (1987) (probation revocation is burden in addi-

---

[14] We note that in *Crone* v. *Gill*, 250 Conn. 476, 480–81, 736 A.2d 131 (1999), we rejected an attorney's claim that any injury to his reputation as a result of a trial court decision disqualifying him from representing a particular client demonstrated the requisite aggrievement to establish standing. Our reasoning in that case, however, may be reconciled with our decision in *Whitney*, in which we recognized that injury to an attorney's reputation was a cognizable collateral consequence sufficient to defeat a claim of mootness. *State* v. *Whitney*, supra, 227 Conn. 837–38 n.13. In *Crone*, we rejected the plaintiff's claim on the ground that he had failed to satisfy the *second* prong of the aggrievement test, which would have required that the plaintiff demonstrate that the right to represent a particular client was protected under the plaintiff's general right to practice law. *Crone* v. *Gill*, supra, 481. We did express doubts, however, as to whether the plaintiff could satisfy the first prong of the test, because the plaintiff had failed to offer specific proof as to harm to his reputation. Id., 480–81. The plaintiff had claimed that an injury arose because his disqualification "was tantamount to a finding of professional misconduct." Id., 481 n.6. We questioned whether the plaintiff had suffered any injury because the trial court did not denigrate the plaintiff's capabilities or integrity but, rather, predicated its decision on protecting the client from the plaintiff's potential conflict of interest. Id. By contrast, in *Whitney*, the plaintiff was found to have violated the Rules of Professional Conduct. *State* v. *Whitney*, supra, 837–38 n.13.

tion to conviction that "will affect . . . [defendant's] standing in the community because it connotes wrongdoing and intractability").

We need not decide in the present case whether any one of the adverse effects identified herein would be sufficient on its own to establish a reasonable possibility of collateral consequences from the commissioner's decision to revoke the plaintiff's special license. We conclude, instead, that the totality of these possible consequences is sufficient to permit the trial court to retain jurisdiction over the plaintiff's claim.

The commissioner cites four cases in support of her contention that the plaintiff has not established the requisite collateral consequences: *Phaneuf* v. *Commissioner of Motor Vehicles*, 166 Conn. 449, 352 A.2d 291 (1974); *In re Jeffrey C.*, 64 Conn. App. 55, 779 A.2d 765 (2001), rev'd on other grounds, 261 Conn. 189, 802 A.2d 772 (2002); *In re Elizabeth H.*, 45 Conn. App. 508, 696 A.2d 1291, cert. denied, 243 Conn. 903, 701 A.2d 328 (1997), cert. denied, 523 U.S. 1137, 118 S. Ct. 1840, 140 L. Ed. 2d 1091 (1998); and *Daly* v. *DelPonte*, 27 Conn. App. 495, 608 A.2d 93 (1992), rev'd on other grounds, 225 Conn. 499, 624 A.2d 876 (1993). We find nothing in any of these cases that contravenes the reasoning that we have set forth in this opinion.

*Phaneuf* and *Daly* both involved appeals from a decision by the commissioner of motor vehicles suspending the plaintiff's driver's license. At issue in each case was whether the claim had been rendered moot when the suspension had expired.[15] *Phaneuf* v. *Commissioner of*

---

[15] As the commissioner points out, the plaintiff in *Daly* also had raised a challenge to the motor vehicle commissioner's decision placing him on medical probation as a condition of retaining his driver's license. *Daly* v. *DelPonte*, supra, 27 Conn. App. 499. The Appellate Court determined that this claim also was moot because, once the plaintiff's license had been suspended, the condition of probation was rendered meaningless. Id. The opinion in *Daly* does not indicate, however, that the plaintiff had ever raised in the Appellate Court the issue of collateral consequences arising from the imposition of the condition to defeat the assertion of mootness.

*Motor Vehicles,* supra, 166 Conn. 450; *Daly* v. *DelPonte,* supra, 27 Conn. App. 496. In each of those cases, the court mentioned two possible collateral consequences, determined that the consequences were, in fact, nonexistent, and, accordingly, concluded that the plaintiff's claim was moot.[16] *Phaneuf* v. *Commissioner of Motor Vehicles,* supra, 452–53; *Daly* v. *DelPonte,* supra, 502–503. In *In re Jeffrey C.,* supra, 64 Conn. App. 65–67, the Appellate Court never addressed potential collateral consequences but, instead, analyzed whether an exception to mootness—that the claim is " 'capable of repetition, yet evading review' "—was satisfied. The analysis undertaken by a court in applying that exception, however, is different than the one used in determining if collateral consequences have been established. See *In re Elizabeth H.,* supra, 45 Conn. App. 510–12 (analyzing mootness issue under both approaches).

In *In re Elizabeth H.,* however, the Appellate Court addressed a claim of collateral consequences similar to the claims raised in the present case. In that case, the plaintiffs appealed from a judgment adjudicating their children as neglected, uncared for and abused. Id., 509. During the course of the proceedings, the children reached the age of majority. Id. Nevertheless, the plaintiffs contended that the appeal was not moot, claiming that the adjudication could make them ineligible to become foster parents. Id., 510. The Appellate Court rejected this claim, in part, because the bar to becoming a foster parent arose from an order for temporary cus-

---

[16] The Appellate Court determined that "[a] driver's license suspension . . . 'does not have the effect of a conviction, nor would [it] entail any of the collateral legal disabilities ordinarily produced by conviction of a criminal offense.' " *Daly* v. *DelPonte,* supra, 27 Conn. App. 503, quoting *Phaneuf* v. *Commissioner of Motor Vehicles,* supra, 166 Conn. 453. The court also rejected the notion that the plaintiff could suffer adverse effects arising from points entered onto his record because he had failed to demonstrate that points in fact had been so entered. *Phaneuf* v. *Commissioner of Motor Vehicles,* supra, 453; *Daly* v. *DelPonte,* supra, 503.

tody, not the judgment from which the plaintiffs were appealing.[17] Id. The Appellate Court also considered and rejected as a potential collateral consequence the damage to the plaintiffs' reputation arising from the trial court's adjudication of their children as neglected. Id., 511. In reaching that conclusion, the Appellate Court noted that the record of the juvenile proceedings that had given rise to the plaintiffs' claim was confidential and sealed. Id., citing General Statutes § 46b-124 (a). There is no such statutory protection available to the plaintiff in the present case. See footnote 11 of this opinion.

Accordingly, we conclude that the plaintiff has established a reasonable possibility of prejudicial collateral consequences from the commissioner's decision to revoke her special license that permit the trial court to retain jurisdiction over her appeal from that decision.

The judgment of the Appellate Court is affirmed.

In this opinion SULLIVAN, C. J., and PALMER and VERTEFEUILLE, Js., concurred.

BORDEN, J., with whom NORCOTT and ZARELLA, Js., join, dissenting. In my opinion, the majority has misapplied the collateral consequences exception to the mootness doctrine in the present case. I, therefore, respectfully dissent.

In *State* v. *McElveen*, 261 Conn. 198, 208, 802 A.2d 74 (2002), we recently reaffirmed our adherence to the collateral consequences exception to the mootness doctrine, and stated that, for such an exception to apply, a litigant must show "that there is a reasonable possibility

---

[17] The court in *In re Elizabeth H.*, supra, 45 Conn. App. 510, also noted that there was no evidence in the record that the plaintiffs had any intention of applying to become foster parents in the future. By contrast, in the present case, the plaintiff has assumed the care of three children who are not her own, underscoring the reasonable possibility that she will become a foster parent in the future.

that prejudicial collateral consequences will occur" if the underlying judgment or, as in this case, the administrative ruling is permitted to stand. We further stated that, in this context, a "reasonable possibility" must amount to more than mere conjecture but need not be more probable than not. Id. Thus, a "reasonable possibility" of adverse consequences stemming from the judgment at issue must be something more than a possibility, but may be less than a probability.

We also took the occasion in *McElveen* to articulate the rationale for the exception: "Where there is no direct practical relief available from the reversal of the judgment, as in this case, the collateral consequences doctrine acts as a surrogate . . . afford[ing] the litigant some practical relief . . . ." Id. Thus, the rationale for the collateral consequences doctrine is rooted in the very mootness doctrine to which it is an exception. The mootness doctrine turns on the inability of the court to afford some practical relief to the litigant from the judgment under appeal. See, e.g., *Darien* v. *Estate of D'Addario*, 258 Conn. 663, 676, 784 A.2d 337 (2001). If, however, there is no *direct* practical relief available from a reversal of the judgment, the collateral consequences doctrine acts as a surrogate: it applies where there is some *indirect*, or *collateral*, relief that a decision in the case in question will provide.

The emphasis, in both the doctrine and the exception, is on practicality. This suggests, therefore, that, in applying the collateral consequences doctrine, the court should be able to identify those collateral consequences that have some modicum of concreteness, because the doctrine serves as a surrogate for otherwise concrete adverse consequences supplied by a judgment that is not moot. I agree with the majority that the "reasonable possibility" test is an appropriate formulation of how to go about identifying that modicum of concreteness. Unless that test is applied with some sense of reason-

able restraint, however, the exception will far outstrip its fundamental purpose. This is where I part company with the majority in the present case. In my view, the collateral consequences identified by the majority in the present case are possible and conjectural, but no more.

It is necessary, first, to state certain facts that are disclosed by the record, most, but not all, of which the majority notes. In July, 1992, Patricia R. (mother) had in her custody four of her seven children: E, born October 12, 1983; S, born December 30, 1987; D, born July 4, 1991; and K, born June 7, 1992. Each of these children has a different father. They are, therefore, half siblings of each other. Furthermore, the father of D is the brother of the plaintiff, Shirley Williams, in the present case. Therefore, the plaintiff is the aunt of D.

In July, 1992, all four children were placed with the plaintiff, pursuant to a voluntary placement agreement with the department of children and families (department), because their mother, who had a long history of drug abuse, could not care for them. In addition, the mother has three other children who had been removed from her home as a result of her inability to provide for them, but none of those children had been placed with the plaintiff. Thus, in July, 1992, the plaintiff took in D and D's three half siblings, keeping that portion of the mother's family together. At the same time, the plaintiff applied to the Probate Court for formal guardianship of D, who was her only blood relation among the four half siblings. The plaintiff also has children of her own.

In January, 1993, the following occurred: (1) the department issued to the plaintiff the special study foster care license, which is the subject of this case, for S, K, and E; and (2) the Probate Court declared the plaintiff legal guardian of D. Therefore, at that time the plaintiff was the special study foster care licensee of S,

K and E, and the guardian of D. Thereafter, in December, 1996, E ran away from the home after allegedly attacking two of the plaintiff's own children, and the plaintiff requested that he not be returned to her. E is now eighteen years old and, therefore, wholly outside the department foster care system. In September, 1996, K's putative father consented to the termination of his parental rights. In February, 1997, the parental rights of the mother were terminated with respect to both S and K.[1] Thus, when the department ultimately revoked the plaintiff's special study foster care license in June, 1999,[2] she was the special licensee of S and K, and the guardian of D.

As the majority notes, the plaintiff appealed to the trial court from the revocation and filed a habeas corpus petition seeking custody of S and K. The department then decided to support the plaintiff's petition for custody, and, as a result, the court named the plaintiff legal guardian and custodian of S and K. This rendered moot any need for a continuation of the special study foster care license, which was the subject of the appeal. Accordingly, the trial court dismissed the appeal as moot.

Thus, to summarize the entire factual picture, as disclosed by the record: the plaintiff was originally the physical custodian of four of seven half siblings by the same mother, one of whom was her niece. One of the four is now an adult, and the plaintiff is now the guard-

---

[1] The record also reveals that, in February, 1996, the department petitioned to terminate the parental rights of S's father, as well. That petition, however, was subsequently withdrawn, as the department felt that it had not made reasonable efforts to reunify S with her father.

[2] The basis of the revocation was that the plaintiff was in violation of department regulations regarding: (1) who may be members of the household; and (2) the provision of substitute care. The record discloses that the factual basis for the first ground was that a child of the plaintiff, who was then living in the home, had a drug-related felony conviction. The record does not disclose the factual basis for the second ground.

ian of the other three children, including her niece. Furthermore, the department specifically supported her postlicense revocation petition to be named the guardian of the two children who are the subject of the license presently at issue.

With this background in mind, I turn to the majority's conclusion that the revocation of the special study foster care license concerning S and K is not moot because there is a reasonable possibility of adverse consequences to the plaintiff from the revocation of that license. The majority offers three bases that, in its view, taken together satisfy the reasonable possibility standard: (1) "the reasonable possibility that the department could use the plaintiff's license revocation to her detriment in future proceedings"; (2) the "reasonable possibility of adverse use of the plaintiff's record" by disclosure thereof "to numerous government agencies upon request" pursuant to General Statutes (Rev. to 2001) § 17a-28 (f), as amended by No. 01-142, § 1, of the 2001 Public Acts;[3] and (3) such a dissemination

[3] General Statutes (Rev. to 2001) § 17a-28 (f), as amended by No. 01-142, § 1, of the 2001 Public Acts, enumerates a variety of exceptions to the confidentiality of access to certain department records, providing: "The commissioner or the commissioner's designee shall, upon request, promptly provide copies of records, without the consent of a person, to (1) a law enforcement agency, (2) the Chief State's Attorney or the Chief State's Attorney's designee or a state's attorney for the judicial district in which the child resides or in which the alleged abuse or neglect occurred or the state's attorney's designee, for purposes of investigating or prosecuting an allegation of child abuse or neglect, (3) the attorney appointed to represent a child in any court in litigation affecting the best interests of the child, (4) a guardian ad litem appointed to represent a child in any court in litigation affecting the best interests of the child, (5) the Department of Public Health, which licenses any person to care for children for the purposes of determining suitability of such person for licensure, (6) any state agency which licenses such person to educate or care for children pursuant to section 10-145b or 17a-101j, (7) the Governor, when requested in writing, in the course of the Governor's official functions or the Legislative Program Review and Investigations Committee, the committee of the General Assembly on judiciary and the committee of the General Assembly having cognizance of matters involving children when requested in the course of such committees' official functions in writing, and upon a majority vote of said committee,

pursuant to § 17a-28 (f) "would taint the plaintiff's repu-
tation." I discuss each of these in turn.

The majority's first basis, namely, that the department
could use the revocation to the plaintiff's detriment in
future proceedings, is explicitly grounded in the asser-
tion that there is a "reasonable possibility that the plain-
tiff will be asked again to assume the role of foster
parent either by her brother or by the children's mother,
who has a history of drug addiction and who repeatedly
has turned to the plaintiff for help."[4] This assertion,

provided no names or other identifying information shall be disclosed unless
it is essential to the legislative or gubernatorial purpose, (8) a local or
regional board of education, provided the records are limited to educational
records created or obtained by the state or Connecticut-Unified School
District #2, established pursuant to section 17a-37, and (9) a party in a
custody proceeding under section 17a-112, or section 46b-129, as amended
by this act, in the Superior Court where such records concern a child who
is the subject of the proceeding or the parent of such child. A disclosure
under this section shall be made of any part of a record, whether or not
created by the department, provided no confidential record of the Superior
Court shall be disclosed other than the petition and any affidavits filed
therewith in the superior court for juvenile matters, except upon an order
of a judge of the Superior Court for good cause shown. The commissioner
shall also disclose the name of any individual who cooperates with an
investigation of a report of child abuse or neglect to such law enforcement
agency or state's attorney for purposes of investigating or prosecuting an
allegation of child abuse or neglect. The commissioner or the commissioner's
designee shall, upon request, promptly provide copies of records, without
the consent of the person, to (A) the Department of Public Health for the
purpose of determining the suitability of a person to care for children in a
facility licensed under sections 19a-77 to 19a-80, inclusive, 19a-82 to 19a-
87, inclusive, and 19a-87b, and (B) the Department of Social Services for
determining the suitability of a person for any payment from the department
for providing child care."

[4] In this connection, the majority also asserts that "the plaintiff has
assumed the care of three children who are not her own, underscoring the
reasonable possibility that she will become a foster parent in the future."
There are two fatal flaws in this overbroad assertion. First, the "three
children who are not her own" also happen to be the half siblings of her
niece, for all of whom she assumed the care at the same time, in an obvious
and laudable effort to keep at least part of the mother's biological family
together. There is not a shred of evidence, or any indication, in this record
to suggest that she is a candidate to be a special foster care licensee for
other, totally unrelated children. Second, she is not, and never has been, a

however, is predicated upon *all* of the following events taking place: (1) either the plaintiff's brother or the mother will have a child in the future;[5] (2) that child will be by a partner who will, herself or himself, be unable to care for the child; (3) the plaintiff will again be asked, and will be willing, to take the child in, either under a voluntary placement agreement or under a new special study foster care license; and (4) the department will somehow use the revocation against the plaintiff by deciding to oppose such an arrangement. I concede that this entire chain of events *possibly* could occur. I suggest, however, that it is not *reasonably* possible, in the sense of being anything more than mere conjecture, especially considering that the department already has demonstrated its confidence in the plaintiff's parenting abilities by explicitly supporting her successful application to be named the guardian of S and K,[6] and that the

---

"foster parent." She has only been a special study foster parent licensee, a status that, as the majority notes, occurs typically "when a parent of a child committed to the custody of the department requests that a specific individual, who is not licensed to provide general foster care, provide foster care to his or her child." There is nothing in this record to suggest anyone else who will make such a request.

[5] Of course, we do not even know the age of the mother, or her current childbearing ability. We do know, however, that she has one son, E, who is now almost nineteen years old, and we also know that she has had three other children, ages unknown, who may be even older than E. The majority is nonetheless willing to assume, as an underpinning of its reasonable possibility analysis, that she will bear a child in the future.

[6] In this connection, the majority asserts "that if the commissioner [of the department] has no intention of ever using the record to the plaintiff's detriment, the commissioner easily could have resolved this matter at any stage in the proceedings, throughout this lengthy appellate process, by vacating the revocation decision voluntarily." In my view, this is a grossly unfair argument by the majority. First, as a factual matter, until this statement by the majority, no one—least of all the plaintiff herself—has ever suggested that the commissioner do so. Indeed, there has been no indication by the plaintiff, as opposed to the majority, that such an action by the commissioner would have satisfied the plaintiff so that *she* would then have accepted a mootness determination. Second, as a matter of law, this court has never—until now—suggested that, in order for an administrative action, which was presumptively valid when taken but that was mooted by subsequent events, should be voluntarily vacated simply to avoid a legal claim that the collateral

mother's other three children were *not* placed with the plaintiff, indicating that neither the mother nor the department has ever considered the plaintiff as the only resource for her children.

The majority's second basis is that there is a reasonable possibility of the revocation being disclosed pursuant to § 17a-28 (f); see footnote 3 of this opinion; to the plaintiff's detriment in a "variety of ways . . . ." The majority does not, however, either analyze just how the revocation would be disclosed pursuant to that statute, or explain how such disclosure would adversely affect the plaintiff. I suggest that such an analysis demonstrates, again, nothing more than conjecture.

Section 17a-28 (f) provides for department records, which are otherwise confidential, to be disclosed without the consent of the subject of the records, "upon request," to the following named agencies or persons under specified circumstances: (1) a law enforcement agency; (2) the chief state's attorney or a state's attorney for a judicial district investigating an allegation of child abuse; (3) an attorney representing a child in litigation involving his or her best interests; (4) a guardian ad litem representing a child in litigation involving his or her best interest; (5) the department of public health in proceedings involving licensure under that department; (6) any state agency that licenses individuals to educate or care for children pursuant to General Statutes § 10-145b or General Statutes § 17a-101j; (7) the governor and certain legislative committees; (8) local or regional boards of education; and (9) a party in a custody pro-

consequences exception applies so as to avoid mootness. Third, does the majority mean to suggest that, had the commissioner taken such an extraordinary and unrequested action, the majority would be prepared to reach a different result? If so, then it should say so, and now that the issue has been raised, give both parties the opportunity to brief their respective views on such an unprecedented question. If not, then I fail to see the relevance of the assertion.

ceeding where the records at issue concern the subject child or his or her parent. The statute also provides for disclosure to the department of public health for the purpose of determining one's suitability for employment in a child care facility, and the department of social services regarding the suitability of a person for payment from the department for child care. A careful analysis of the statute, as applied to the facts of this case, demonstrates that the possibility of disclosure under any of these provisions is no more than speculative, and that, even if there were such disclosure, the possibility of harm is, similarly, no more than speculative.

Disclosure to a law enforcement agency presumes that someone would have accused the plaintiff of having committed some crime, and that the law enforcement agency would somehow use the special foster care license revocation to her detriment in investigating that crime. It is pure conjecture that the plaintiff would, in the future, be the subject of a criminal investigation, and even more conjectural that, if that somehow were to come to pass, it would be the type of criminal investigation that could possibly implicate this record of revocation. Disclosure to the state's attorneys explicitly presupposes that the plaintiff would be accused of child abuse. There is not a shred of evidence in this record to suggest such a possibility. Disclosure to an attorney or guardian ad litem presupposes some litigation over the child's best interest. It is difficult to imagine who would be initiating such litigation over S and K, especially considering that their parents' parental rights have been terminated.[7] Disclosure upon request by the

---

[7] As previously stated, the department voluntarily withdrew its petition to terminate the parental rights of S's father in 1996. This alone, however, does not suggest that, at some future time, S's father will seek to assert his parental rights by way of litigation. The only *possible* legal proceeding he could initiate in this regard would be a petition to revoke the plaintiff's guardianship of S. The department's records reveal that, as of March, 1999, its plan with respect to S was reunification with her father, to be completed

public health department is not a reasonable possibility because there is no indication that the plaintiff might ever seek licensure from that agency. Disclosure to a state agency that licenses individuals to educate and care for children is, likewise, a remote possibility. First, there is nothing to indicate that the plaintiff may, at some future date, seek employment requiring teacher certification pursuant to § 10-145b. Second, there is nothing in the record to support the inference that the plaintiff is likely to seek licensure to provide care for children at an institution or facility as contemplated by § 17a-101j. Disclosure to the governor or legislature is limited by the provision that "no names or other identifying information shall be disclosed unless it is essential to the legislative or gubernatorial purpose . . . ." General Statutes § 17a-28 (f) (7). It is difficult to imagine such a scenario regarding the identity of the plaintiff, S or K. Disclosure to the specified boards of education

within a six month period. Notably absent from such records, however, is any reference to the plaintiff's guardianship as an obstacle to reunification, or to the initiation or pendency of proceedings to transfer legal guardianship back to S's father. There is also no indication that reunification was actually effectuated. Given S's father's history of minimal contact with his daughter and minimal involvement in her actual upbringing, it is not unreasonable to speculate that the department's plan for reunification was never consummated, rendering the chances of litigation surrounding S's best interests even more speculative. In the event, however, that such litigation does come to pass, disclosure of the plaintiff's special foster care license revocation would be unlikely unless the plaintiff contested the matter. Even if we are to assume, without deciding, that the plaintiff would oppose a petition to revoke her guardianship of S, and that her license revocation would be disclosed as part of those proceedings, there is no reasonable possibility that such disclosure would be harmful. As stated in the text of this opinion, any negative reputational harm or harm to the plaintiff's legal position that may arise from disclosure of the revocation in this context would, undoubtedly, be offset by the fact that: (1) the Probate Court concluded that the plaintiff was a suitable parental substitute for S's father despite the revocation and, accordingly, that court appointed her the legal guardian of S; and (2) the department supported the plaintiff's petition for guardianship irrespective of the revocation. Thus, in my view, there is no reasonable possibility of disclosure of the revocation or its alleged, attendant harm on these facts.

under the statute does not even apply to these records, because that disclosure is limited to certain specified educational records. Disclosure to a party in a custody proceeding involving either S or K is not a reasonable possibility, because there are no such parties anywhere on the horizon. See footnote 7 of this opinion. Finally, there is no indication that the plaintiff will ever seek employment from a licensed child care facility, or that, if she is receiving or is eligible for child care payments for S and K from the department of social services, it will have any reason to request this record of revocation, or that it would somehow thereby deny her benefits to which she was otherwise entitled.

The majority's third basis, namely, that the revocation proceeding would taint the plaintiff's reputation, is specifically tied to the purported disclosure of such proceeding "to various government agencies pursuant to § 17a-28 (f) . . . ." Thus, in the majority's view, the potential for disclosure under that statute gives rise to a reasonable possibility of harm to the plaintiff's reputation. I have already discussed why, in my view, no such disclosure is a reasonable possibility. If there is no such possibility of disclosure, then there is no such possibility of any reputational harm. I would only add to this what I note previously, namely, that even if the revocation were somehow disclosed pursuant to that statute—a potentiality that is no more than conjectural—it would be accompanied by the concomitant fact of the department's specific judicial endorsement of the plaintiff as a suitable guardian for S and K. This fact can only detract from the otherwise slim possibility of reputational harm that could possibly flow from any such disclosure.

Finally, I address the majority's position that it need not consider whether any one of these possible adverse effects would establish a reasonable possibility on its own, because the majority concludes that their totality

is sufficient to establish a reasonable possibility of harmful collateral consequences. That cannot be the appropriate analysis of the collateral consequences exception to the mootness doctrine. One cannot establish a reasonable possibility by simply adding up several conjectures. If that were so, then one could always establish a reasonable possibility of harm simply by stretching one's imagination far enough to encompass numerous conjectural harms, and then adding them up to equal a reasonable possibility. To quantify the matter, suppose we could conjecture six possible harms, each of which had no more than a 5 percent chance of occurring. By the majority's approach, there would be a 30 percent chance of harm. Indeed, if we could imagine eleven of such harms, their total would become more probable than not. Under this approach, then, the exception would truly swallow the rule.

Accordingly, I conclude that there is no reasonable possibility of adverse collateral consequences in the present case, and the case is therefore moot. I would reverse the judgment of the Appellate Court and remand the case to that court with direction to affirm the trial court's judgment of dismissal.