TOWN OF WALLINGFORD *v.* DEPARTMENT
OF PUBLIC HEALTH
(SC 16632)

Sullivan, C. J., and Borden, Norcott, Vertefeuille and Zarella, Js.

*(Two justices concurring separately in one opinion)*

Argued October 23, 2002—officially released March 25, 2003

*Janis M. Small*, town attorney, for the appellant (plaintiff).

*Richard J. Lynch*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (defendant).

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether the trial court improperly concluded that the defendant, the department of public health (department), has jurisdiction over land owned by the plaintiff, the town of Wallingford (town), even though the land is not owned by the town's water division and is not used for water utility purposes pursuant to General Statutes (Rev. to 1999) § 25-32[1] et seq. The trial court

---

[1] General Statutes (Rev. to 1999) § 25-32 provides in relevant part: "(a) The Department of Public Health shall have jurisdiction over all matters concerning the purity and adequacy of any source of water or ice supply used by any municipality, public institution or water or ice company for obtaining water or ice, the safety of any distributing plant and system for public health purposes, the adequacy of methods used to assure water purity, and such other matters relating to the construction and operation of such

rendered judgment dismissing the town's appeal from

distributing plant and system as may affect public health. The qualifications of the operators of water treatment plants or water distribution systems which treat or supply water used or intended for use by the public shall be subject to the approval of said department pursuant to regulations adopted by the commissioner in accordance with chapter 54.

"(b) No water company shall sell, lease, assign or otherwise dispose of or change the use of any watershed lands, except as provided in section 25-43c, without a written permit from the Commissioner of Public Health. Said commissioner shall not grant a permit for the sale, lease or assignment of class I land, except as provided in subsection (d), and shall not grant a permit for a change in use of class I land unless the applicant demonstrates that such change will not have a significant adverse impact upon the present and future purity and adequacy of the public drinking water supply and is consistent with any water supply plan filed and approved pursuant to section 25-32d. The commissioner may reclassify class I land only upon determination that such land no longer meets the criteria established by subsection (a) of section 25-37c because of abandonment of a water supply source or a physical change in the watershed boundary. Not more than fifteen days before filing an application for a permit under this section, the applicant shall provide notice of such intent, by certified mail, return receipt requested, to the chief executive officer and the chief elected official of each municipality in which the land is situated.

"(c) The Commissioner of Public Health may grant a permit for the sale, lease, assignment or change in use of any land in class II subject to any conditions or restrictions in use which the commissioner may deem necessary to maintain the purity and adequacy of the public drinking water supply, giving due consideration to: (1) The creation and control of point or nonpoint sources of contamination; (2) the disturbance of ground vegetation; (3) the creation and control of subsurface sewage disposal systems; (4) the degree of water treatment provided; (5) the control of watershed land by the applicant through ownership, easements or use restrictions or other water supply source protection measures; (6) the effect of development of any such land; and (7) any other significant potential source of contamination of the public drinking water supply. The commissioner may reclassify class II land only upon determination that such land no longer meets the criteria established by subsection (b) of section 25-37c because of abandonment of a water supply source or a physical change in the watershed boundary.

"(d) The commissioner may grant a permit for the sale of class I or II land to another water company, to a state agency or to a municipality if the purchasing entity agrees to maintain the land subject to the provisions of this section, any regulations adopted pursuant to this section and the terms of any permit issued pursuant to this section. Such purchasing entity may not sell, lease, assign or change the use of such land without obtaining a permit pursuant to this section.

"(e) The commissioner shall not grant a permit for the sale, lease, assign-

the department's declaratory ruling that the land is subject to the department's jurisdiction as " 'water company land' " under § 25-32. The town appeals[2] from, and we affirm, the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. The town is a municipality that operates its own water division as a governmental department under the town charter. The town's board

ment or change in use of any land in class II unless (1) the land in class II is being sold, leased or assigned as part of a larger parcel of land also containing land in class III and use restrictions applicable to the land in class II will prevent the land in class II from being developed, or (2) the applicant demonstrates that the proposed sale, lease, assignment or change in use will not have a significant adverse impact upon the purity and adequacy of the public drinking water supply and that any use restrictions which the commissioner requires as a condition of granting a permit can be enforced against subsequent owners, lessees and assignees and (3) the commissioner determines, after giving effect to any use restrictions which may be required as a condition of granting the permit, that such proposed sale, lease, assignment or change in use will not have a significant adverse effect on the public drinking water supply, whether or not similar permits have been granted.

"(f) The term 'source of water or ice supply' includes all springs, streams, watercourses, brooks, rivers, lakes, ponds, wells or underground waters from which water or ice is taken, and all springs, streams, watercourses, brooks, rivers, lakes, ponds, wells or underground waters tributary thereto and all lands drained thereby; and the term 'watershed land' means land from which water drains into a public drinking water supply. . . ."

Section 25-32 was subsequently amended by Public Acts 2001, No. 01-204, § 4, which repealed subsection (d) and substituted the following:

"(d) The commissioner may grant a permit for (1) the sale of class I or II land to another water company, to a state agency or to a municipality, or (2) the sale of class II land or the sale or assignment of a conservation restriction or a public access easement on class I or class II land to a private, nonprofit land-holding conservation organization if the purchasing entity agrees to maintain the land subject to the provisions of this section, any regulations adopted pursuant to this section and the terms of any permit issued pursuant to this section. Such purchasing entity or assignee may not sell, lease or assign any such land or conservation restriction or public access easement or sell, lease, assign or change the use of such land without obtaining a permit pursuant to this section."

[2] The town appealed from the trial court's judgment to the Appellate Court. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

of public utilities commission, whose commissioners are appointed by the town mayor and confirmed by the town council, supervises and sets policy for the water division.[3] Water division personnel are town employees.

Pursuant to General Statutes § 7-240,[4] the water division is a self-sustaining entity, the funds of which are held separately from the town's general fund; all moneys received by the water division are used for the provision of water service. The water division's operation is paid for by the businesses and residents that it serves; not all residents or businesses are connected to the water division's water supply system. The water division's budget, however, is controlled and approved by the town council. Moreover, the public utilities commission has no authority to develop a budget or operate the water division without town council approval, and the water division does not pay taxes to the town. The town purchases insurance for the water division; that cost, however, is recouped annually through the division's rates. Under the town charter, any land purchased by the water division must be acquired in the name of the town. When the water division discontinues the use of any such property, the use of the property reverts to the town.

In January, 1999, the town purchased the parcel at issue in this case, the Cooke property, for open space or other necessary purposes. No water division funds

---

[3] The board of public utilities commission also oversees the town's sewer and electric divisions.

[4] General Statutes § 7-240 provides: "A separate account shall be kept by the municipality of the funds derived from such waterworks system and of their disposition, which account shall be audited annually by a competent auditor, and a report of such audit shall be open to public inspection. The treasurer of the municipality shall be the custodian of such funds and shall give bond to the satisfaction of the legislative body for the faithful discharge of his duties. *Such funds shall be kept separate from other funds of such municipality and shall be used for such waterworks system and for no other purpose.*" (Emphasis added.)

were used to make the purchase. The property is located within the watershed of the south central regional water authority, which supplies the New Haven region with drinking water. Although the property is part of the watershed, potentially impacting New Haven's drinking water, it has no effect on the town's drinking water supply. In May, 1999, the mayor, on behalf of the town, notified the department that the property had been purchased and that the town was considering constructing a golf course on the Cooke property. In June and July, 1999, the department notified the town that a permit was required to change the property's use, such as by constructing a golf course, despite the fact that the property is not part of the watershed impacting the *town's* water supply.

In March, 2000, the town filed this petition with the department seeking a declaratory ruling to determine whether the Cooke property was, pursuant to § 25-32, subject to the department's jurisdiction as "water company land." The town claimed that the statute was not applicable because the town could not be considered a water company; therefore, the town contended that the land at issue was not water company property. The department ruled that the statute applied to all land owned by the town, and that the property was, therefore, subject to department jurisdiction as "water company land located on a public drinking water supply watershed." In issuing its ruling, the department noted the town's "special duties and responsibilities to the public" because of its role as a governmental entity that is also a water company.

The town appealed from the department's ruling to the trial court. While that appeal was pending in the trial court, the General Assembly enacted Public Acts, Spec. Sess., June, 2001, No. 01-4, § 13 (Spec. Sess. P.A.

01-4).[5] This act resolved the specific controversy over the Cooke property that led to the town's request for the department's declaratory ruling. It permits "any municipality owning land purchased in January, 1999, that was formerly used for agricultural purposes and that is watershed land or is located adjacent to watershed land [to] use such municipally-owned land for the construction and operation of a golf course," subject to certain environmental protection conditions on land ownership and management. Spec. Sess. P.A. 01-4, § 13; see footnote 5 of this opinion. The trial court ruled as a threshold matter that the legislation did not render the case moot because it did not resolve the issue of the department's jurisdiction over the remainder of the town's nonwater utility land. Both parties agreed with the trial court's mootness determination because the town owned other land not used for water utility purposes that might also be subject to the department's jurisdiction.

Turning to the merits of the case, the trial court then applied the standard of review set forth by this court

[5] Public Acts, Spec. Sess., June, 2001, No. 01-4, § 13, provides: "Notwithstanding any provision of chapter 474 of the general statutes or the regulations of Connecticut state agencies, any municipality owning land purchased in January, 1999, that was formerly used for agricultural purposes and that is watershed land or is located adjacent to watershed land may use such municipally-owned land for the construction and operation of a golf course, subject to the following conditions: (1) The golf course shall be owned by the municipality; (2) best management practices, as recommended from time to time by the Department of Environmental Protection, shall be used in the design, construction and operation of the golf course, including, but not limited to, integrated pest management and above-ground storage of chemicals and fuels; and (3) the manager of the golf course shall file an annual report with any water company owned by the municipality, any water company drawing water from the watershed, the Department of Environmental Protection and the municipality describing the best management practices used in the operation of the golf course, including, but not limited to, a description of the kind and amount of pesticides and herbicides used on the golf course during the year and such other information as may be requested by any such water company or the Department of Environmental Protection. Such report shall be made available to the public."

in *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 109, 653 A.2d 782 (1995),[6] and noted that the department's factual findings were uncontested. The trial court then proceeded to construe the language and legislative history of § 25-32. It concluded that the town was a water company explicitly subject to regulation by the department, and that requiring it to comply with the department's water supply planning requirements would not harm the town, while at the same time it would effectuate the legislative policy of protecting Connecticut's drinking water. Accordingly, the trial court rendered judgment dismissing the town's appeal. This appeal followed.

## I

## MOOTNESS

As a threshold matter, we first address whether the trial court properly concluded that the passage of Spec. Sess. P.A. 01-4, § 13, did not render the matter moot because of the effect of the department's ruling on the other town owned, nonwater utility lands.[7] The depart-

---

[6] The trial court quoted this court's decision in *Bridgeport Hospital* and applied the following standard of review for an administrative appeal involving statutory interpretation. "We recognize our usual rule of according deference to the construction given a statute by the agency charged with its enforcement. . . . Deference may be appropriate when the issue is the application of general statutory language to a particular fact-bound controversy. As we have stated many times, the factual and discretionary determinations of administrative agencies are to be given considerable weight by the courts . . . [however] it is for the courts, and not for administrative agencies, to expound and apply governing principles of law. . . . [*Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, supra, 232 Conn. 109]. Although the court may not substitute its own conclusions for those of the administrative board, it retains the ultimate obligation to determine whether the administrative action was unreasonable, arbitrary, illegal or an abuse of discretion." (Internal quotation marks omitted.)

[7] This court, sua sponte, directed the parties to file supplemental briefs limited to the following issue: "Did the passage of Public Acts, Spec. Sess., June, 2001, No. 01-4, § 13, render the matter moot because it resolved the specific controversy between the parties concerning the development of the Cooke Property?"

ment claims that the matter is not moot because Spec. Sess. P.A. 01-4 does not change the ruling that the town government is a water company subject to its jurisdiction, or negate the regulatory scheme, except for the limited authorization to use the property in question as a golf course. The town contends that the matter is not moot because its position is that the Cooke property is not subject to department jurisdiction in any way, whatever its intended use. The town also claims that this case falls into the "capable of repetition, yet evading review" exception to the mootness doctrine. See *Loisel* v. *Rowe*, 233 Conn. 370, 385, 660 A.2d 323 (1995). We agree with the parties and the trial court that this matter is not moot. We base our conclusion, however, on the collateral consequences doctrine, as recently stated in *State* v. *McElveen*, 261 Conn. 198, 802 A.2d 74 (2002), and *Williams* v. *Ragaglia*, 261 Conn. 219, 802 A.2d 778 (2002).

Mootness is a question of justiciability that must be determined as a threshold matter because it "implicates [this] court's subject matter jurisdiction . . . ." *Board of Education* v. *Naugatuck*, 257 Conn. 409, 412, 778 A.2d 862 (2001). Indeed, we are required to address this question of justiciability, even in the "unusual situation" where all of the parties agree that the matter is not moot. Id. We begin with "the four part test for justiciability established in *State* v. *Nardini*, 187 Conn. 109, 445 A.2d 304 (1982). . . . 'Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will

result in practical relief to the complainant.' . . . Id., 111–12." *Board of Education* v. *Naugatuck,* supra, 416.

The mootness doctrine is rooted in the first factor of the *Nardini* test. *State* v. *McElveen,* supra, 261 Conn. 204–205. It is founded on "the same policy interests as the doctrine of standing, namely, to assure the vigorous presentation of arguments concerning the matter at issue. . . . This court recently reiterated that the standing doctrine is designed to ensure that courts and parties are not vexed by suits brought to vindicate non-justiciable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Citation omitted; internal quotation marks omitted.) Id., 204. Indeed, we note that "courts are called upon to determine existing controversies, and thus may not be used as a vehicle to obtain advisory judicial opinions on points of law." Id., 204–205.

"[A]n actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.) Id., 205. However, under "this court's long-standing mootness jurisprudence . . . despite developments during the pendency of an appeal that would otherwise render a claim moot, the court may retain jurisdiction when a litigant shows that 'there is a reasonable possibility that prejudicial collateral consequences will occur.' Id., 208 . . . ." (Citations omitted.) *Williams* v. *Ragaglia,* supra, 261 Conn. 226.

"[T]o invoke successfully the collateral consequences doctrine, the litigant must show that there is a reasonable possibility that prejudicial collateral consequences

will occur. Accordingly, the litigant must establish these consequences by more than mere conjecture, but need not demonstrate that these consequences are more probable than not. This standard provides the necessary limitations on justiciability underlying the mootness doctrine itself. Where there is no direct practical relief available from the reversal of the judgment, as in this case, the collateral consequences doctrine acts as a surrogate, calling for a determination whether a decision in the case can afford the litigant some practical relief in the future." *State* v. *McElveen*, supra, 261 Conn. 208.

*Williams* v. *Ragaglia*, supra, 261 Conn. 221–23, is particularly instructive on the showing necessary, in the context of administrative appeals, to establish a reasonable possibility of collateral consequences.[8] In *Williams*, the commissioner of children and families issued a decision revoking the plaintiff's special study foster care license as a consequence for violating certain department foster care regulations. Id. The commissioner then initiated proceedings to remove the foster children, who were the subjects of the original foster care license, from the plaintiff's home. Id., 223. The plaintiff responded by filing a habeas corpus petition seeking legal custody of the children, along with a con-

---

[8] By way of illustration, we note that prejudicial collateral consequences most obviously arise in the criminal context. In *McElveen*, we concluded that despite the expiration of his sentence, the defendant's appeal on the issue of his probation revocation was not moot because of the collateral consequences doctrine. *State* v. *McElveen*, supra, 261 Conn. 216. We noted that the reasonably probable collateral consequences stemming from probation revocation are similar to those of criminal convictions, and include loss of standing in the community, employment difficulties and compromised ability to receive bail in the future, Id., 214–16. In *McElveen*, however, we ultimately dismissed the defendant's appeal as moot because we determined that there was no controversy between the parties; the defendant had subsequently pleaded guilty to criminal charges for the conduct underlying the probation revocation, thereby "eliminat[ing] the controversy before the court." Id., 218.

temporaneous administrative appeal. Id. While the administrative appeal was pending, the plaintiff was granted legal custody of the two children as a result of the habeas corpus petition. Id., 224. As legal guardian, the plaintiff no longer needed the special foster care license and the trial court dismissed her administrative appeal as moot. Id. We, however, concluded that the dismissal on mootness grounds was improper. Id., 224; see id., 228–29. We noted that the commissioner could use the plaintiff's license revocation against her in future department proceedings; id., 227; a consequence that was not unduly speculative because of "the reasonable possibility that a person, such as the plaintiff, who has agreed selflessly to become a foster parent to children not her own, will again in the future become a foster parent and have occasion to interact with the department."[9] Id., 229. We concluded that, under the totality of circumstances, the matter was not moot and the trial court could retain jurisdiction because the plaintiff had sufficiently established the reasonable possibility of prejudicial collateral consequences from the commissioner's decision. Id., 236.

In the present case, we are satisfied that, under the totality of the circumstances, there is a reasonable possibility of prejudicial collateral consequences for the town from the department's ruling. The department's ruling declaring the town a water company potentially subjects the town to statutory responsibilities that exceed the boundaries of the Cooke property.[10] See

[9] We also noted the harm to the plaintiff's reputation and the possibility that a license revocation could be used against the plaintiff in other nondepartment proceedings as reasonably possible collateral consequences stemming from the foster care license revocation. *Williams* v. *Ragaglia*, supra, 261 Conn. 231–32.

[10] Among these statutory responsibilities are, for example, the preparation of detailed water supply plans, under General Statutes § 25-32d, and the provision of water conservation educational materials, pursuant to General Statutes § 25-32k. We view the scope of the present controversy between the town and the department, however, as limited to the § 25-32 jurisdictional

General Statutes (Rev. to 1999) § 25-32 et seq. Moreover, the planning for the golf course is still in an embryonic stage; regardless of whether a golf course is ever built on the subject land,[11] the town's land remains subject to the department's jurisdiction as a result of the original agency ruling. We, therefore, conclude that Spec. Sess. P.A. 01-4, § 13, did not render this case moot because of the prejudicial collateral consequences for the town from the department's ruling.[12]

---

issue. We, therefore, will not address what would potentially constitute compliance, by the town, with each discrete statutory requirement.

[11] Indeed, the town's counsel noted at oral argument before this court that the golf course may well never be built.

[12] The town claims that this case is not moot because of the "capable of repetition, yet evading review" exception to the mootness doctrine. We take the opportunity to clarify the difference between the "capable of repetition, yet evading review" mootness exception, and the collateral consequences doctrine. Both doctrines are exceptions to the mootness doctrine because they arise when no consequences can flow directly from adjudication of the case before us, and therefore, the case would be presumptively moot.

The key analytical distinction lies in the type of injury; the collateral consequences doctrine applies when the collateral consequences of the contested court action, such as the continuing stigma of a criminal conviction, constitute a continuing injury to the specific litigant, justifying the court's retention of jurisdiction over the dispute, despite the lack of any consequences flowing from the adjudication directly at issue in the appeal. *Williams* v. *Ragaglia*, supra, 261 Conn. 226. Thus, a live controversy continues to exist between the parties because of that continuing injury.

By contrast, the "capable of repetition, yet evading review" rule reflects the "functionally insurmountable time constraints" present in certain types of disputes. *Conetta* v. *Stamford*, 246 Conn. 281, 297, 715 A.2d 756 (1998). Paradigmatic examples are abortion cases and other medical treatment disputes. See *Stamford Hospital* v. *Vega*, 236 Conn. 646, 654–55, 674 A.2d 821 (1996) (validity of injunctions permitting nonconsensual blood transfusions); *Loisel* v. *Rowe*, supra, 233 Conn. 385 (providing examples). "[F]or an otherwise moot question to qualify for review under the 'capable of repetition, yet evading review' exception, it must meet three requirements. First, the challenged action, or the effect of the challenged action, by its very nature must be of a limited duration so that there is a strong likelihood that the substantial majority of cases raising a question about its validity will become moot before appellate litigation can be concluded. Second, there must be a reasonable likelihood that the question presented in the pending case will arise again in the future, and that it will affect either the same complaining party or a reasonably identifiable group for whom that party can be said

II

## STANDARD OF REVIEW

The first substantive issue in this appeal is whether the trial court applied the proper standard of review in its analysis of the department's declaratory ruling by applying the standard set forth in *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, supra, 232 Conn. 109. See footnote 6 of this opinion. The town claims that the trial court misapplied *Bridgeport Hospital* by omitting the portion of that opinion declining to give deference to agency decisions involving questions of law not previously subject to judicial scrutiny; *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, supra, 110; thereby resulting in an improperly deferential review of the department's statutory interpretation. The department contends that the trial court properly deferred to the department's factual findings while correctly engaging in a broader review of its legal conclusions and statutory interpretation. We agree with the department and conclude that the trial court applied the correct standard of review in this administrative appeal.

The standard of review applied by the trial court is an accurate statement of the well established law governing judicial review of statutory interpretations by administrative agencies. In *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 669, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001), we stated: "Although the interpretation of statutes is ultimately a question of law . . . it is the

to act as surrogate. Third, the question must have some public importance. Unless all three requirements are met, the appeal must be dismissed as moot." *Loisel* v. *Rowe*, supra, 382–83. Thus, this exception to the mootness doctrine is rooted in a determination that, when its requirements are met, public policy requires that we decide the question, despite the fact that our decision will have no direct consequences in the case before us.

well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . We also have held that an exception is made when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference." (Citations omitted; internal quotation marks omitted.) Accord *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities,* supra, 232 Conn. 109 ("[a]s we have stated many times, the factual and discretionary determinations of administrative agencies are to be given considerable weight by the courts . . . [however] it is for the courts, and not for administrative agencies, to expound and apply governing principles of law" [citations omitted; internal quotation marks omitted]). Our review of the trial court's memorandum of decision, with its thorough analysis of the language and legislative history of § 25-32, indicates that the trial court applied the proper standard of review and did not give improper deference to the department's statutory interpretation.

## III

### CONSTRUCTION OF GENERAL STATUTES (REV. TO 1999) § 25-32

We next consider the principal issue in this case, which is whether the trial court properly construed § 25-32 when it concluded that the department has jurisdiction over town owned land not used for water utility purposes. The town claims that the trial court's interpretation was improper because both the statutory framework and the legislative history evince the legislature's

intent to confine the statute's application to only those town owned properties used for water utility purposes. The department contends that the statutory language and legislative purpose support a broad construction of the statute and its application to all town owned land. We agree with the department.

"Statutory interpretation is a matter of law over which this court's review is plenary." (Internal quotation marks omitted.) *Hammond* v. *Commissioner of Correction,* 259 Conn. 855, 861, 792 A.2d 774 (2002). We follow the method of statutory interpretation recently articulated in *State* v. *Courchesne,* 262 Conn. 537, 816 A.2d 562 (2003). "The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity. Thus, we do not follow the plain meaning rule.

"In performing this task, we begin with a searching examination of the language of the statute, because that is the most important factor to be considered. In doing so, we attempt to determine its range of plausible meanings and, if possible, narrow that range to those that appear most plausible. We do not, however, end with the language. We recognize, further, that the purpose or purposes of the legislation, and the context of the

language, broadly understood, are directly relevant to the meaning of the language of the statute.

"This does not mean, however, that we will not, in a given case, follow what may be regarded as the plain meaning of the language, namely, the meaning that, when the language is considered without reference to any extratextual sources of its meaning, appears to be *the* meaning and that appears to preclude any other likely meaning. In such a case, the more strongly the bare text supports such a meaning, the more persuasive the extratextual sources of meaning will have to be in order to yield a different meaning." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 577–78.

The present case is this court's first opportunity to construe § 25-32. We start our analysis with the relevant statutory language, and note the broad phrasing of General Statutes (Rev. to 1999) § 25-32 (a), which provides that the department "shall have jurisdiction over *all* matters concerning the purity and adequacy of any *source of water* or ice supply used by *any* municipality, public institution or water or ice company for obtaining water or ice, the safety of any distributing plant and system for public health purposes, the adequacy of methods used to assure water purity, *and such other matters relating to the construction and operation of such distributing plant and system as may affect public health. . . .*" (Emphasis added.) See footnote 1 of this opinion. Subsection (b) of General Statutes (Rev. to 1999) § 25-32 then provides: "No *water company* shall sell, lease, assign or otherwise dispose of or *change the use of any watershed lands,* except as provided in section 25-43c, without a written permit from the Commissioner of Public Health. . . ." (Emphasis added.) See footnote 1 of this opinion. The remainder of subsection (b) and subsections (c) through (e) of General Statutes (Rev. to 1999) § 25-32 describe the

permitting process and the factors that the department commissioner should consider in granting permits for two of the three classes[13] of water company land.[14] See footnote 1 of this opinion. Finally, subsections (f) through (*l*) of General Statutes (Rev. to 1999) § 25-32 provide additional definitions, directives and authority for the commissioner.

The applicability of § 25-32 is controlled by the definition of the term of "water company." A statutory definition for "water company" is provided by General

[13] General Statutes § 25-37c provides: "The Department of Public Health shall adopt, in accordance with chapter 54, regulations establishing criteria and performance standards for three classes of water-company-owned land.

"(a) Class I land includes all land owned by a water company or acquired from a water company through foreclosure or other involuntary transfer of ownership or control which is either: (1) Within two hundred and fifty feet of high water of a reservoir or one hundred feet of all watercourses as defined in agency regulations adopted pursuant to this section; (2) within the areas along watercourses which are covered by any of the critical components of a stream belt; (3) land with slopes fifteen per cent or greater without significant interception by wetlands, swales and natural depressions between the slopes and the watercourses; (4) within two hundred feet of groundwater wells; (5) an identified direct recharge area or outcrop of aquifer now in use or available for future use, or (6) an area with shallow depth to bedrock, twenty inches or less, or poorly drained or very poorly drained soils as defined by the United States Soil Conservation Service that are contiguous to land described in subdivision (3) or (4) of this subsection and that extend to the top of the slope above the receiving watercourse.

"(b) Class II land includes all land owned by a water company or acquired from a water company through foreclosure or other involuntary transfer of ownership or control which is either (1) on a public drinking supply watershed which is not included in class I or (2) completely off a public drinking supply watershed and which is within one hundred and fifty feet of a distribution reservoir or a first-order stream tributary to a distribution reservoir.

"(c) Class III land includes all land owned by a water company or acquired from a water company through foreclosure or other involuntary transfer of ownership or control which is unimproved land off public drinking supply watersheds and beyond one hundred and fifty feet from a distribution reservoir or first-order stream tributary to a distribution reservoir."

[14] Unlike class I or class II land, water company land in the class III category is not subject to restrictions on alienation or change of use. See General Statutes (Rev. to 1999) §§ 25-32 and 25-37c (c).

Statutes § 25-32a,[15] and it includes "any . . . *munici-pality* . . . which owns, maintains, operates, manages, controls or employs any pond, lake, reservoir, well, stream or distributing plant or system that supplies water to two or more consumers or to twenty-five or more persons on a regular basis . . . ." (Emphasis added.) See footnote 15 of this opinion. Thus, the precise question presented in this case is whether the trial court properly construed the term "municipality" under § 25-32a to encompass the town, rather than limiting it to the town's water division as a separate entity.

We conclude that the trial court properly determined that the town is a "water company" within the § 25-32a definition, thus subjecting it to the department's jurisdiction under § 25-32. It is undisputed that the town is a municipality controlling the water division. The language of the statute is the most important guide to determining the legislature's intent; see *State* v. *Courchesne*, supra, 262 Conn. 578; this statutory definition, therefore, strongly suggests the conclusion that the town is included within the definition of "water company."

Moreover, this strong linguistic suggestion is supported by our review of the pertinent legislative history. The legislature enacted Public Acts 1977, No. 77-606, § 4, subsequently codified as § 25-32, as a result of rec-

---

[15] General Statutes § 25-32a provides in relevant part: "As used in sections 25-32, 25-33 and 25-34 . . . 'water company' means any individual, partnership, association, corporation, municipality or other entity, or the lessee thereof, who or which owns, maintains, operates, manages, controls or employs any pond, lake, reservoir, well, stream or distributing plant or system that supplies water to two or more consumers or to twenty-five or more persons on a regular basis provided if any individual, partnership, association, corporation, municipality or other entity or lessee owns or controls eighty per cent of the equity value of more than one such system or company, the number of consumers or persons supplied by all such systems so controlled shall be considered as owned by one company for the purposes of this definition."

ommendations by the council on water company lands, an agency created in 1975 "to recommend to the Legislature a comprehensive policy on disposition of the lands held by water utilities." 20 H.R. Proc., Pt. 14, 1977 Sess., p. 5855, remarks of Representative Dorothy S. McCluskey. Public Act 77-606 implemented the land classification and department review scheme of § 25-32; it expressly stated in the section codified as General Statutes § 25-37a[16] that the statutes were intended to protect the state's water supply and noted that watershed "lands constitute a significant portion of the remaining undeveloped and open space lands in close proximity to the urbanized areas of the state, and that it is in the public interest that there be established criteria for the orderly disposition of such lands. . . ."[17] Thus, § 25-32 et seq. are "statutes whose object is the protection and preservation of the public health" that

---

[16] General Statutes § 25-37a provides: "The General Assembly finds and declares that an adequate supply of pure water is and will always be essential for the health and safety and economic well-being of the state, that lands acquired for public water supply purposes are and will in the future be necessary to protect the public water supply notwithstanding the availability of water filtration plants; that some of such lands have been acquired by water companies having the power of eminent domain, that such lands are in imminent danger of being disposed of by water companies for residential and commercial development, that such lands constitute a significant portion of the remaining undeveloped and open space lands in close proximity to the urbanized areas of the state, and that it is in the public interest that there be established criteria for the orderly disposition of such lands. The General Assembly further finds and declares that in order to protect the purity and adequacy of the water supply the Department of Public Health should be directed to revise its procedure for the review of applications to sell water company land located on public drinking water supply watersheds, that the disposition of such land prior to the revision of application review procedures would jeopardize the public health and welfare, and that therefore the prohibition against sale or development of water company land located on the watershed should be extended for a period of three years from June 26, 1977."

[17] This purpose is also reflected by legislators' statements during the debate preceding the statutes' enactment. See, e.g., 20 S. Proc., Pt. 10, 1977 Sess., p. 4198, remarks of Senator Betty Hudson; 20 H.R. Proc., supra, pp. 5856–57, remarks of Representative McCluskey.

we deem remedial in purpose; accordingly, we construe them liberally. *State* v. *Racskowski*, 86 Conn. 677, 680, 86 A. 606 (1913); accord *BEC Corp.* v. *Dept. of Environmental Protection*, 256 Conn. 602, 621–22, 775 A.2d 928 (2001) ("[o]ur conclusion that the individual [corporate officers] personally are liable under [General Statutes] § 22a-432 is supported by the broad remedial purpose of the act, which is to protect the waters of the state from pollution"). Our reading of the broad language of § 25-32a serves to effectuate the legislative policy of protecting the adequacy and purity of Connecticut's drinking water. We, therefore, reject the town's narrower interpretation of these statutes' applicability[18] because it thwarts the legislature's goal of providing maximum protection for Connecticut's drinking water supply.

The town cites to General Statutes § 7-234[19] et seq., the statutes providing for the establishment of munici-

---

[18] The town correctly notes that when the legislature enacted § 25-32 et seq., it only intended to address land owned by water utilities. Lands owned by nonutilities were not covered by the statutes; applying restrictions to those lands was deemed a "long and sticky problem . . . need[ing] separate consideration." Conn. Joint Standing Committee Hearings, Environment, Pt. 3, 1977 Sess., p. 763, remarks of Sally Richards, chairperson, Connecticut council on water company lands. The town contends that a colloquy at an environment committee hearing between Richards and Representative Rufus Allyn about the limits of the statutes' coverage; see id., pp. 763–64; and later statements by Representative Allyn referring to the need for the law to apply uniformly to "municipally owned water operations"; see id., pp. 839–40; indicate that the statutes were intended to apply only to municipalities' water divisions, not to the governments themselves. This colloquy is simply too ambiguous to lead us to conclude that, insofar as the meaning of the statute is concerned, it trumps both the broad language and remedial purpose of the legislation as ultimately enacted. Thus, we reject the town's narrow construction of the statute based on this particular aspect of the legislative history.

[19] General Statutes § 7-234 provides: "Any town, city or borough or district organized for municipal purposes may acquire, construct and operate a municipal water supply system where (1) there is no existing private waterworks system, (2) the owner or owners of a private waterworks system are willing to sell or transfer all or part of such system to the municipality, or (3) a public regional waterworks system within said town, city or borough

pal waterworks systems, as support for the proposition that the legislature intended the water division to be an entity legally distinct from the town government itself; thereby drawing a distinction between land owned or utilized by the water division and land owned by a municipality's general government. The department responds by arguing that the town and the water division constitute a single economic enterprise for regulatory purposes. We agree with the department.

The town specifically cites to General Statutes §§ 7-235[20] and 7-240[21] as support for its contention that the town and the water division are separate legal entities. Section 7-235 allows municipalities to issue revenue bonds for the construction, enlargement or maintenance of waterworks systems and provides that the municipalities are only obligated to pay the bonds from

or district is willing to sell or transfer all or part of the system to the municipality. The franchise jurisdiction of the municipal water supply system shall be enlarged, by special act, if applicable to include the system or portion thereof sold or transferred and the franchise jurisdiction of the acquired waterworks system shall be reduced, by special act, if applicable to exclude the system or portion thereof sold or transferred. Any such municipality may pay for the acquisition, construction, extension, enlargement and maintenance of any such system by the issuance of general obligation bonds as provided in chapter 109 or by the issuance of revenue bonds as hereinafter provided. Any municipality having the right to acquire all or any part of an existing private waterworks system pursuant to any municipal charter, special act or contract may relinquish such rights by action of its legislative body."

[20] General Statutes § 7-235 provides: "The legislative body of any municipality described in section 7-234, which municipality has voted to construct, enlarge or maintain a waterworks system, shall cause an estimate to be made of the cost of such construction and may issue, in the name of such municipality, revenue bonds in an amount sufficient to meet such estimated cost and interest thereon until the date of maturity. *Such municipality shall not be obligated to pay such bonds except from funds derived from the net revenue of such waterworks system,* and it shall be stated on the face of each bond that it has been issued under the provisions of this chapter and that it does *not constitute a general indebtedness of such municipality* within any statutory limitation." (Emphasis added.)

[21] See footnote 4 of this opinion.

water utility net revenue; the bonds do "not constitute a general indebtedness of such municipality within any statutory limitation." See footnote 20 of this opinion. Section 7-240 requires municipalities to keep water utility funds separate from other municipal accounts, with no commingling, and provides that those moneys "shall be used for such waterworks system and for no other purpose." See footnote 4 of this opinion. The town's reliance on these statutes is misplaced.

The town's argument is supported by neither the statutory language nor the legislative history of § 7-234 et seq. The legislature contemplated no legal distinction between the municipality and its water division; both the language and the legislative discussion focus on the responsibilities of "municipalities," not their water divisions or water departments. See 12 H.R. Proc., Pt. 8, 1967 Sess., p. 3345, remarks of Representative A. Lucille Matarese; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1967 Sess., p. 435, remarks of attorney Isaac Russell (statement supporting enactment). Moreover, the statutory language and the available legislative history indicate that these statutes solely govern municipal water utility financing, and, therefore, cannot be construed as diminishing municipalities' public health or environmental protection responsibilities. Representative David H. Neiditz, sponsor of the bill that was enacted as 1967 Public Acts, No. 780, and codified as General Statutes (Cum. Sup. 1967) § 7-234, stated that "generally moderniz[ing] the statutes in an area of water and sewer bonding . . . is such an important area today when *we are concerned with water pollution.*" (Emphasis added.) Conn. Joint Standing Committee Hearings, supra, pp. 394–95. We, therefore, do not read these statutes as evincing any legislative desire to deem municipalities and their water divisions to be separate legal entities, especially where such a con-

struction would frustrate the goal of protecting the drinking water supply.[22]

We also agree with the department's contention that treating the town and its water division as separate entities would create an invitation for the town to frustrate the legislature's intent and avoid the department's regulatory jurisdiction by transferring the classified land to otherwise "exempt" divisions. The courts of this state have never countenanced the tactic of avoiding regulation via organizational " 'Balkanization.' " *Commission on Hospitals & Health Care* v. *Lakoff*, 214 Conn. 321, 332, 572 A.2d 316 (1990) (rejecting restrictive interpretation of General Statutes § 19a-145, now § 19a-630, defining " 'health care facility or institution' " where that "reading . . . would enable providers of health care services to avoid regulation by the commission by the mere juggling of corporate entities or careful allocation of services to different operations. Such 'Balkanization' of inherently unitary health services can only chip away at the commission's authority in this vitally important area of service to Connecticut's citizens."); see also *General Telephone Co. of the Southwest* v. *United States*, 449 F.2d 846, 855 (5th Cir. 1971) ("[w]here the statutory purpose could thus be easily frustrated through the use of separate corporate entities, the Commission is entitled to look through corporate form and treat the separate entities as one and

---

[22] These financing statutes had already been in existence for more than ten years when the legislature developed the land classification scheme. "Where, as here, more than one statute is involved, we presume that the legislature intended them to be read together to create a harmonious body of law . . . . The legislature is presumed to be aware and to have knowledge of all existing statutes and the effect which its own action or nonaction may have on them." (Citation omitted; internal quotation marks omitted.) *State* v. *George B.*, 258 Conn. 779, 795, 785 A.2d 573 (2001). Because the two sets of statutes are intended to serve different legislative goals, we do not perceive any conflict between them requiring judicial resolution.

the same for purposes of regulation").[23] We, therefore, conclude that the trial court correctly determined that the town government is a municipal "water company" whose land is subject to the department's jurisdiction under § 25-32.

The judgment is affirmed.

In this opinion BORDEN and VERTEFEUILLE, Js., concurred.

SULLIVAN, C. J., with whom ZARELLA, J., joins, concurring. I concur in the majority's judgment that the defendant, the department of public health, has regulatory jurisdiction over all of the property belonging to the plaintiff, the town of Wallingford, that is "watershed land" pursuant to General Statutes (Rev. to 1999) § 25-32 (b), subject to the plaintiff's right to build a golf course on the Cooke property pursuant to Public Acts, Spec. Sess., June, 2001, No. 01-4, § 13 (Spec. Sess. P.A. 01-4). I write separately to express my disagreement from the majority with regard to three components of its analysis.

First, I agree with the majority that this appeal is not moot. In my view, however, this is because Spec. Sess. P.A. 01-4, § 13, does not prevent us from providing the practical relief requested by the plaintiff's petition for a declaratory ruling and its administrative appeal. See

---

[23] Application of the economic enterprise theory in the related, but distinct, context of corporate taxation is also illustrative. Compare *Hartford Steam Service Co.* v. *Sullivan*, 26 Conn. Sup. 277, 281, 220 A.2d 772 (1966) (upholding imposition of gross earnings tax on corporate parent because "where the economic enterprise is one, the corporate forms being largely paper arrangements that do not reflect the business realities, the court should deal with the realities"), with *SFA Folio Collections, Inc.* v. *Bannon*, 217 Conn. 220, 235, 585 A.2d 666, cert. denied, 501 U.S. 1223, 111 S. Ct. 2839, 115 L. Ed. 2d 1008 (1991) (rejecting application of *Hartford Steam Service Co.* economic enterprise theory where "business reality is that [subsidiary] is not a paper arrangement but a separate and independently functioning corporation").

*State* v. *McElveen*, 261 Conn. 198, 208, 802 A.2d 74 (2002). Accordingly, I see no need to employ the collateral consequences doctrine as does the majority. See id. My conclusion rests upon an analysis of the precise nature of the plaintiff's claims and the resolution of those claims by the defendant and the trial court.

The plaintiff broadly sought a declaratory ruling from the defendant as "to the applicability of . . . § 25-32 et seq. to Town-owned, non-utility land." The impetus for this request was that the plaintiff was "considering changing the use of the Cooke property." The defendant issued a declaratory ruling in which it found that the plaintiff had purchased the property for "open space purposes or such other purposes as the [plaintiff] may decide are necessary" and that "the [plaintiff] was investigating the feasibility of creating a golf course on the property." The defendant ultimately concluded that the Cooke property was subject to its jurisdiction. The plaintiff appealed to the trial court, claiming that "the Cooke property is not subject to . . . § 25-32 et seq. . . . ."

While the plaintiff's appeal was pending, Spec. Sess. P.A. 01-4, § 13, was enacted and took effect. That act provided, in effect, that the plaintiff may use the Cooke property for "the construction and operation of a golf course," subject to certain conditions including that: (1) the plaintiff own the course; (2) the course be designed, constructed and operated in accordance with practices as specified by the department of environmental protection; and (3) the plaintiff file certain reports related to the environmental management of the course. Spec. Sess. P.A. 01-4, § 13.

Subsequently, the trial court concluded that, despite the intervening passage of the public act, the appeal was not moot because the "issue of the department's jurisdiction over what the plaintiff has termed 'town-

owned, non-utility land' " was still in dispute. Ulti-
mately, the trial court dismissed the plaintiff's appeal.

From this procedural history, I conclude the follow-
ing. First, the plaintiff's petition for a declaratory ruling
and its administrative appeal were both wholly silent
as to the intended use of the Cooke property as a golf
course. Second, the plaintiff's petition for a declaratory
ruling and its administrative appeal were not limited to
a request for a determination of the applicability of
§ 25-32 (b), but rather requested a ruling as to the appli-
cability of all of the defendant's regulatory powers pur-
suant to § 25-32 et seq. Third, Spec. Sess. P.A. 01-4, § 13,
mooted only the question of whether the plaintiff would
need to receive a § 25-32 (b) permit were it to build a
golf course. Fourth, the trial court's holding applied
beyond the Cooke property and extended to all "town-
owned, non-utility land."

Thus, in my view, there is no need to resort to the
collateral consequences doctrine, because, were we to
reverse the judgment, the plaintiff would then be free
to: (1) change the use of the Cooke property to some-
thing other than a golf course without seeking a § 25-
32 (b) permit; (2) refuse to list the Cooke property as
well as other property that it owns on its water supply
plans pursuant to General Statutes § 25-32d;[1] (3) change
the use of other watershed property without being sub-
ject to the defendant's § 25-32 (b) regulatory jurisdic-
tion. None of this relief is provided by Spec. Sess. P.A.
01-4, § 13, and, thus, the case is not moot.

Second, although the majority does not reach the
question of whether the plaintiff is required to list the
Cooke property on its water supply plan pursuant to

---

[1] The trial court's decision is ambiguous as to whether it concluded that
the plaintiff is required to list the Cooke property in its § 25-32d water supply
plan. As discussed subsequently, the majority opinion does not determine
whether the plaintiff is required to list the property.

§ 25-32d; see footnote 10 of the majority opinion; I would reach this issue and conclude that the plaintiff is not so required. Although, I acknowledge that this was not the plaintiff's primary issue on appeal, the issue is fairly encompassed within the plaintiff's petition for a declaratory ruling and was raised in both the trial court and in this court. Accordingly, I would reach the issue.

General Statutes § 25-32d provides in relevant part: "(b) Any water supply plan submitted pursuant to this section shall evaluate *the water supply needs in the service area of the water company* submitting the plan and propose a strategy to meet such needs. The plan shall include . . . (6) a forecast of any future land sales, an identification which includes the acreage and location of any land proposed to be sold, sources of public water supply to be abandoned and any land owned by the company which it has designated, or plans to designate, as class III land . . . ." (Emphasis added.)

Thus, I would interpret the application of § 25-32d listings to be restricted to those lands that might potentially affect the "water supply needs in the service area of the water company . . . ." General Statutes § 25-32d (b). The defendant's own regulations implementing this statutory provision support this interpretation. The defendant requires that a water supply plan contain: "A *description of the existing water supply system, including* . . . a list and description of: water company owned lands . . . ." (Emphasis added.) Regs., Conn. State Agencies § 25-32d-3 (a) (2).

It is undisputed that the Cooke property has no effect on the *plaintiff's* water supply. Thus, the plaintiff is not required to list the Cooke property on its water supply plan.[2] It is, however, subject to the defendant's

[2] The defendant may, however, have regulatory jurisdiction pursuant to § 25-32d (b) over certain other lands of the plaintiff, as long as those lands are related to the "water supply needs in the service area of the water company . . . ."

§ 25-32 (b) powers to the extent that those powers have not been limited by Spec. Sess. P.A. 01-4, § 13. This is because the § 25-32 (b) permitting process applies to "any watershed lands," whether or not such lands have an impact upon the plaintiff's water supply or some other water company's water supply.

Finally, I write to express my disagreement with the majority's unpersuasive use of legislative history to bolster its conclusion. In my view, that history simply fails to illuminate, in the slightest, the question at bar in this case. Therefore, I believe that the majority opinion provides yet another example of the misuse of such history, like those that Justice Zarella persuasively criticized in his dissent, in which I joined, in *State* v. *Courchesne*, 262 Conn. 537, 597, 816 A.2d 562 (2003).

As noted previously, the primary question in this appeal is whether all of the watershed lands owned by the plaintiff are subject to the defendant's § 25-32 (b) permitting powers. The majority states that the legislative history supports its conclusion that the plaintiff's lands are so subject. The only legislative history cited in support of its conclusion, however, at best, simply supports the express broad *statutory* purpose to provide for the orderly disposition of watershed lands as an important natural resource. In my view, as the majority itself seems to acknowledge, the legislative history that it cites adds nothing to its statutory argument. Hence, I do not see how this legislative history supports its conclusion. Consequently, I would rely solely on the statutory text in interpreting the relevant statutory provisions in this appeal.