******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## IN RE P. M.*
## (AC 47076)

Alvord, Cradle and Suarez, Js.

*Syllabus*

The respondent father appealed to this court from the judgment of the trial court adjudicating his minor child, P, neglected and ordering a six month period of protective supervision. *Held*:

1. Contrary to the assertion of the petitioner, the Commissioner of Children and Families, that the respondent father's claim was moot, this court concluded that his claim was reviewable under the collateral consequences exception to the mootness doctrine; although the period of protective supervision had expired, there was a reasonable possibility that P's neglect adjudication would have prejudicial collateral consequences, as the Superior Court could, at some time in the future, rely on the neglect adjudication, pursuant to the applicable statute (§ 17a-112 (j) (3) (B) (i)), in granting a petition to terminate the father's parental rights as to P.

2. The respondent father could not prevail on his claim that there was insufficient evidence to support the trial court's determination that P was neglected; the court's factual findings, which were supported by sufficient evidence in the record, demonstrated that the homemade infant formula that the father had been feeding P caused P's severe malnutrition and his failure to thrive, and the father's failure to follow medical recommendations to regularly take P to a medical provider for well-baby checkups prevented detection of P's failure to thrive.

Argued April 8—officially released June 18, 2024**

*Procedural History*

Petition by the Commissioner of Children and Families to adjudicate the respondents' minor child neglected, brought to the Superior Court in the judicial district of Fairfield, Juvenile Matters, and tried to the court, *McLaughlin, J.*; judgment adjudicating the minor

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

** June 18, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

child neglected, from which the respondent father appealed to this court. *Affirmed.*

*David B. Rozwaski*, assigned counsel, for the appellant (respondent father).

*Albert J. Oneto IV*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Nisa Khan*, assistant attorney general, for the appellee (petitioner).

*Catherine L. Williams*, assigned counsel, for the minor child.

*Opinion*

CRADLE, J. The respondent father, I. M. (respondent), appeals from the judgment of the trial court adjudicating his minor child, P. M. (P), neglected.[1] On appeal, the respondent claims that the court erred in adjudicating P neglected because the evidence relied upon by the court is not sufficient to support its determination that P was denied proper care and attention and was permitted to live under conditions and circumstances injurious to his well-being. We affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of this appeal. P was born healthy and without complications in August, 2022, to T. T. (mother) and the respondent (collectively, parents). P's parents believe in an alkaline, plant-based diet for their family, so they created a home-made infant formula when their first child, C. M. (C), was born in May, 2021. Neha Kaushik, a naturopathic doctor, first met the family and became C's primary care provider when C was approximately six months old. Kaushik had no information about C's growth

---

[1] The respondent mother, T. T., also was named in the neglect petition and appeared in the trial court, but she did not file an appeal. We therefore refer in this opinion to the respondent father as the respondent.

before that time but subsequently worked with the respondent to help him alter the homemade infant formula to ensure that C received necessary nutrients.

About six days after P was born, his parents took him to see Kaushik for his first well-baby visit. At his initial visit in August, 2022, Kaushik spoke to P's parents about their homemade infant formula, and they provided her with a list of ingredients in the formula. Kaushik reviewed the list and made a recommendation to add certain nutrients to the formula. Although P is the youngest patient Kaushik had treated in her career and she did not have experience or specialized training in treating infants, Kaushik indicated that she had no concerns that the homemade infant formula would provide P with the nutrients that he, as an infant, needed in order to develop.

Kaushik followed up with P's parents about the need to bring him in for monthly infant wellness checkups, but they failed to do so. Kaushik did not see P again until December, 2022, when he was ill and present for a virtual appointment during which she diagnosed him with respiratory syncytial virus (RSV) and provided his parents with some naturopathic treatments.

Kaushik next saw P virtually on January 27, 2023. At that visit, P's parents told Kaushik that he had been having breathing difficulties starting on January 25, 2023, and that he was not eating. His parents also indicated that they had provided him with ginger and cucumber water along with other naturopathic treatments. Kaushik gave the parents treatment advice and further explained that they would need to bring him to an urgent care facility if his breathing did not improve in the following two to three hours. When she called P's parents a few hours later, his condition had not improved, and they had not taken him to urgent care. Kaushik told them that she would call the authorities

if they did not take him. Later that evening, P's parents brought him to St. Vincent's Medical Center (St. Vincent's). By the time P arrived at St. Vincent's, he was critically ill, and St. Vincent's transferred him to Yale New Haven Children's Hospital (Yale), where the Yale medical team admitted him and diagnosed him with croup, COVID-19, anemia, and severe metabolic acidosis. The Yale medical team also noted that, despite being five and one-half months old, he presented, in weight, length, and head circumference, as a two month old.

The Yale medical team worked diligently and urgently to stabilize him. On January 28, 2023, the Yale medical team intubated P to treat acute hypoxemia. The Yale medical team later told P's parents that a blood transfusion would be medically necessary to save his life. At first, P's parents would not consent. Even after P's mother consented, the respondent, who was disruptive and aggressive at the hospital, refused to consent. The Yale medical team notified P's parents that they were initiating legal action to obtain a court order to allow the blood transfusion, and the respondent eventually consented to the blood transfusion without a court order being issued. Following the blood transfusion, P started to stabilize.

On January 29, 2023, the petitioner, the Commissioner of Children and Families, invoked a ninety-six hour hold on P and C due to concerns regarding the children's nutritional status.[2] On January 30, 2023, additional members of the Yale medical team became involved with P as it related to his growth and nutrition. Sharon Bertrand, a registered, board-certified dietician

---

[2] The petitioner released the ninety-six hour hold on C when it was determined that he was not malnourished. The petitioner also filed a neglect petition on behalf of C, but the court later granted the respondent's motion to strike the neglect petition. Because the petitioner did not file an amended petition after the court granted the motion to strike, the court dismissed the neglect petition relating to C.

with a specialty certification in pediatric critical care nutrition, diagnosed P as severely malnourished based on his " 'z-scores,' "[3] which were considerably below the standard and placed him barely at the first percentile for growth. In addition, P's lab results revealed that he was deficient in vitamin A, carnitine, and seven essential amino acids.

Bertrand met with the respondent to discuss the ingredients in the homemade infant formula. Although the respondent had given the Yale medical team a list of the formula's ingredients, the list did not provide the measurement of each ingredient or the sources that produced the ingredients. It was also unclear to the Yale medical team how the respondent was making the formula, so there was no way of knowing if the homemade infant formula was contaminated. It was later determined that the homemade infant formula was nutritionally deficient. Bertrand, who found that P's homemade infant formula lacked amino acids, fatty acids, and vitamins, attempted to speak to the respondent about her concerns, but he refused to engage in conversation, talked over her, and was combative. The Yale medical team made the decision to stop using the homemade infant formula and switched to Neocate, a commercially made, vegan, non-soy formula.[4]

On February 2, 2023, the petitioner filed the present neglect petition, alleging that P was neglected in that he

[3] Z-scores, which "measure the growth and nutritional status of infants and children based on weight, length, and head circumference," are "plotted on a standard growth chart provided by the [World Health Organization] and/or the [Centers for Disease Control]." P's z-scores upon his admission to Yale were -3 or -3.4 for weight, -3.45 for length, and -2.6 for head circumference.

[4] At first, the Yale medical team provided P with the homemade infant formula, but it was too thick to pass through the feeding tube once P was intubated. They consulted with Kaushik about possible ways to dilute the formula. The Yale medical team then began feeding P both Neocate and the homemade infant formula but switched exclusively to Neocate in light of their increasing concerns about the homemade infant formula.

had been denied proper care and attention, physically, educationally, emotionally or morally, or that he had been permitted to live under conditions, circumstances or associations injurious to his well-being.[5] On the same day, the court, *Maronich, J.*, granted the petitioner's motion for an ex parte order of temporary custody (OTC), vesting temporary custody of P in the petitioner, and vacated the ninety-six hour hold. On February 22, 2023, the court, *Hon. William Holden*, judge trial referee, sustained the OTC until further order of the court.

On February 10, 2023, the Yale medical team extubated P, but he remained in critical condition, in part, due to his malnutrition. He was steadily gaining weight on the Neocate and his iron and vitamin numbers were stabilizing. On February 27, 2023, the Yale medical team discharged P from the hospital, and the petitioner placed him in the care of his paternal grandmother.

During the neglect trial, which took place on September 21, 25 and 27, 2023, the court, *McLaughlin, J.*, admitted into evidence, inter alia, Yale medical records dated January 28 and February 27, 2023, the affidavits of Chelsea Lepus, an attending physician at the Department of Pediatric Gastroenterology, Hepatology and Nutrition at Yale, and Lisa Pavlovic, the attending pediatrician with the child abuse program at Yale, and a chart made by Kaushik comparing the nutritional content of infant formulas, including the homemade infant formula and Neocate. The petitioner offered the testimony of, among others, Bertrand, Lepus, and Pavlovic. P's mother offered the testimony of Kaushik, and the

---

[5] The petitioner also alleged that P had been abused in that he had physical injuries inflicted by other than accidental means or that he was in a condition that was the result of maltreatment including but not limited to malnutrition, sexual molestation or exploitation, deprivation of necessities, emotional maltreatment or cruel punishment. The court did not find that P was abused or maltreated, and the abuse allegation is not at issue in this appeal.

respondent offered the testimony of P's paternal grand-mother. The court issued a memorandum of decision, dated September 29, 2023, in which it held that "[t]he overwhelming credible evidence established by more than a fair preponderance that, as of the filing of the neglect petition on February 2, 2023, [P] was neglected in that he was denied proper care and attention physi-cally and medically and in that he was permitted to live under conditions or circumstances injurious to his well-being."

In so holding, the court credited the testimony of Bertrand, Lepus, and Pavlovic. Specifically, the court credited their testimony that, based on the severity of P's condition when he was admitted to Yale, he had been malnourished for at least three months prior to his hospitalization. Moreover, the court found Kaushik's testimony unpersuasive and unreliable as to the ade-quacy of P's growth and found equally unreliable her comparison of the respondent's homemade infant for-mula with Neocate. The court further found that P was critically ill when he arrived at Yale, had been malnour-ished well before his admission, and was failing to thrive. The court then concluded that the petitioner had established by more than a fair preponderance of the evidence that P was malnourished because he was not receiving necessary nutrients from the homemade infant formula supplied by his parents.

The court also found that P's parents failed to comply with Kaushik's recommendation of monthly visits as a part of a well-baby care plan. It found that P's parents "simply did not follow up. No doctor saw [P] during the early months of his life. It was not until [P] was sick with RSV that [his] parents reached out to . . . Kaushik. Thereafter, [P's] parents did not seek out medi-cal care for [him] until he was so critically ill that he stayed in the hospital for a month after being intubated and received a blood transfusion." The court concluded

that the evidence established "by more than a fair pre-
ponderance that, as of the filing of the neglect petition,
[P] had not seen a doctor for at least three months
despite repeated attempts by . . . Kaushik to have
[his] parents bring [him] in for a required visit." On
the basis of these conclusions, the court adjudicated P
neglected in that he was denied proper care and atten-
tion physically and medically and in that he was permit-
ted to live under conditions or circumstances injurious
to his well-being. The court then found, by a fair prepon-
derance of the evidence, that it was "in [P's] best interest
to return to his parents' care under a period of six
months of protective supervision." This appeal fol-
lowed.[6]

On appeal, the respondent claims that, in light of the
record as a whole, the evidence relied upon by the trial
court is not sufficient to support the court's adjudica-
tion of neglect.[7] As a preliminary matter, the petitioner

[6] The attorney for the minor child, P, filed a statement adopting the peti-
tioner's brief.

[7] The respondent also cites, in his principal appellate brief, cases that he
contends stand for the proposition that parents have a constitutional right
to maintain the integrity of their family without state interference. See
*Santosky* v. *Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599
(1982); *In re Teagan K.-O.*, 335 Conn. 745, 755–56, 242 A.3d 59 (2020); *In
re Delilah G.*, 214 Conn. App. 604, 613–14, 280 A.3d 1168, cert. denied, 345
Conn. 911, 282 A.3d 1277 (2022). Because the respondent does not engage
in any substantive discussion or clearly set forth any argument as to a
constitutional violation, we decline to review any such claim. See *C. B.* v.
*S. B.*, 211 Conn. App. 628, 630, 273 A.3d 271 (2022) ("[f]or a reviewing court
to judiciously and efficiently . . . consider claims of error raised on appeal
. . . the parties must clearly and fully set forth their arguments in their
briefs" (internal quotation marks omitted)). The respondent's efforts, in his
reply brief and at oral argument before this court, to further address a
potential constitutional claim do not remedy his failure to raise the claim
in his principal appellate brief. *Burton* v. *Dept. of Environmental Protection*,
337 Conn. 781, 797 n.12, 256 A.3d 655 (2021) ("[i]t is well settled that a claim
cannot be raised for the first time at oral argument" (internal quotation
marks omitted)); *Doctor's Associates, Inc.* v. *Keating*, 72 Conn. App. 310,
316, 805 A.2d 120 (2002) ("a reply brief is not the proper vehicle for curing an
omission in the appellant's brief"), aff'd, 266 Conn. 851, 836 A.2d 412 (2003).

challenges this court's subject matter jurisdiction by asserting that the respondent's claim is moot now that the period of protective supervision has expired. The respondent counters that the court's adjudication of neglect has prejudicial collateral consequences that nonetheless entitle his claim to appellate review. We agree with the respondent that his claim is reviewable under the collateral consequences exception to the mootness doctrine, but we nonetheless conclude that the evidence is sufficient to support the court's neglect adjudication.

"Mootness is an exception to the general rule that jurisdiction, once acquired, is not lost by the occurrence of subsequent events. . . . Because mootness goes to the power of this court to entertain an appeal, we address the issue as a threshold matter." (Citation omitted.) *In re Alba P.-V.*, 135 Conn. App. 744, 747, 42 A.3d 393, cert. denied, 305 Conn. 917, 46 A.3d 170 (2012). "Since mootness implicates subject matter jurisdiction . . . [and] raises a question of law . . . our review of that issue is plenary. . . .

"When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot. . . . It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . Nevertheless, the court may retain jurisdiction when a litigant shows that there is a reasonable possibility that prejudicial collateral consequences will occur. . . . Accordingly, the litigant must establish these consequences by more than mere conjecture, but need not demonstrate that these conse-

quences are more probable than not. This standard provides the necessary limitations on justiciability underlying the mootness doctrine itself. Whe[n] there is no direct practical relief available from the reversal of the judgment . . . the collateral consequences doctrine acts as a surrogate, calling for a determination whether a decision in the case can afford the litigant some practical relief in the future." (Citations omitted; internal quotation marks omitted.) *In re Claudia F.*, 93 Conn. App. 343, 345–46, 888 A.2d 1138, cert. denied, 277 Conn. 924, 895 A.2d 796 (2006); see also *Williams* v. *Ragaglia*, 261 Conn. 219, 226–27, 802 A.2d 778 (2002).

In the present case, there is a reasonable possibility that P's neglect adjudication will have prejudicial collateral consequences. Specifically, the Superior Court, at some time in the future, could rely on the present adjudication of neglect in granting a petition to terminate the respondent's parental rights as to P. See *In re Alba P.-V.*, supra, 135 Conn. App. 750 ("[General Statutes § 17a-112 (j) (3) (B) (i)] requires only a single prior adjudication of neglect as to the child who is the subject of a termination of parental rights petition"); see also General Statutes § 17a-112 (j) (3) (B) (i).

The present case is distinguishable from cases in which this court has concluded that a challenge to a neglect adjudication was moot where the parent or guardian of the neglected or uncared for child argued that the adjudication would have collateral consequences for the status of *other* children. See, e.g., *In re Tiarra O.*, 160 Conn. App. 807, 812–13, 125 A.3d 1094 (2015); *In re Claudia F.*, supra, 93 Conn. App. 348. Here, the neglect adjudication could reasonably have collateral consequences for the respondent's parental rights as to the neglected child himself. The present case is also distinguishable from cases in which the neglected child soon would reach the age of majority. See, e.g., *In re Rabia K.*, 212 Conn. App. 556, 562, 275

A.3d 249 (2022) ("the respondent fails to address why there is a reasonable possibility that a future child protection proceeding would be initiated" given that child would turn eighteen in matter of months). Here, P is a toddler, so there exists a reasonable possibility that the neglect adjudication would yield prejudicial consequences before he reaches the age of majority. Last, the present case is distinguishable from cases in which there had been a previous adjudication of neglect of the same child. See, e.g., *In re Alba P.-V.*, supra, 135 Conn. App. 750 ("review of the present [neglect adjudication] would provide the respondent with no practical relief" from collateral consequences for future proceedings because neglected children "would be exposed to a subsequent termination of parental rights proceeding predicated on [earlier neglect adjudications]"). Before September 29, 2023, P had not been adjudicated neglected.[8] Because a court may grant a petition for the termination of parental rights if it finds, among other things, that "the child . . . has been found by the Superior Court or the Probate Court to have been neglected . . . in a prior proceeding"; General Statutes § 17a-112 (j) (3) (B);[9] the present adjudication constitutes a step toward

---

[8] There is evidence in the record of two previous reports of medical neglect involving this family: one related to C in 2021, and another related to P in August, 2022. Both reports raised medical and nutritional concerns, but the petitioner closed its case in September, 2022, and neither child was adjudicated neglected.

[9] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding . . . ."

the termination of the respondent's parental rights as to P that had not previously been taken. Accordingly, we conclude that the respondent's claim is reviewable.[10]

To support his claim on appeal that the evidence was not sufficient to support the court's neglect adjudication, the respondent argues that (1) P did, in fact, receive medical care between the time of his birth and his admission to Yale, (2) the respondent's behavior at Yale reflected his concern for P's treatment and did not interfere with the implementation of medical procedures, (3) P's condition upon admission to Yale was due to "an unfortunate confluence of events starting with the RSV, leading into the COVID-19 and croup infections, and the consequent lack of eating by the child,"; (4) P's family has a history of "small growth" and P's older brother, C, was found to be healthy despite living in the same home and sharing the same diet, and (5) P is progressing well in his overall development. We are not persuaded.

"Neglect proceedings, under . . . [General Statutes] § 46b-129, are comprised of two parts, adjudication and disposition. . . . The standard of proof applicable to nonpermanent custody proceedings, such as neglect proceedings, is a fair preponderance of the evidence. . . .

---

[10] In addition to raising the mootness issue in her appellate brief, the petitioner filed, with this court, a motion to dismiss the appeal as moot. The respondent filed an opposing memorandum in which he argued, inter alia, that his claim is reviewable under the "capable of repetition, yet evading review" exception to the mootness doctrine. This court issued an order for the parties to argue the issue of mootness before this court during oral argument. Counsel for the respondent argued, during oral argument before this court, that the respondent's claim was not moot under the "capable of repetition, yet evading review" exception. Because we determine that the respondent's claim is reviewable under the collateral consequences exception to mootness, we need not address the respondent's "capable of repetition, yet evading review" argument. Accordingly, we deny the petitioner's motion to dismiss.

"During the adjudicatory phase, the court determines if the child was neglected. Practice Book § 35a-7 (a) provides in relevant part: In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment. . . . [General Statutes § 46b-120 (4)] provides that a child may be found neglected if the child is being denied proper care and attention, physically, educationally, emotionally or morally, or is being permitted to live under conditions, circumstances, or associations injurious to the well-being of the child or youth . . . .

"When considering a challenge to the sufficiency of the evidence, the function of an appellate court is to review the findings of the trial court, not to retry the case. . . . [W]e must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . We also must determine whether those facts correctly found are, as a matter of law, sufficient to support the judgment. . . . [W]e give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . ." (Citation omitted; internal quotation marks omitted.) *In re Olivia W.*, 223 Conn. App. 173, 183–84, 308 A.3d 571 (2024).

We conclude that the court's factual findings with regard to its neglect determination were supported by sufficient evidence in the record, including, but not limited to, the testimony of witnesses that the court found credible. Contrary to the respondent's assertion that P's malnutrition was related to his RSV, COVID-19, and croup infections, the court credited the testimony of Bertrand, Lepus, and Pavlovic that P's malnourishment began well before his illnesses and credited

Bertrand's assessment that the homemade infant formula that P's parents had been feeding him prior to his admission to Yale was nutritionally deficient. The Yale medical records in evidence support the court's findings that P's weight, height, and head circumference at the time of the filing of the neglect petition were considerably below the standard for an infant of his age, in contrast with Kaushik's testimony that P's growth was adequate in the early months of his life, which the court explicitly discredited. Moreover, the respondent's assertion that P's older brother, C, had been healthy when being fed a similar diet is belied by the court's discrediting of Kaushik's testimony to that end. The court did, however, credit Kaushik's testimony that she repeatedly recommended to P's parents that they bring him to her office for medical care, and her testimony supports the court's finding that, nonetheless, P had not seen a doctor for months prior to his admission to Yale. Because this court does not retry the facts or pass upon the credibility of witnesses; *In re Niya B.*, 223 Conn. App. 471, 499, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024); we conclude that there was sufficient evidence to support the court's findings of fact.

Finally, to the extent that the respondent claims that the court's findings were insufficient to support an adjudication of neglect, we disagree. We conclude that the facts properly found by the court, which demonstrate that (1) the homemade infant formula that P's parents had been feeding him was the cause of his severe malnutrition and his failure to thrive and (2) the respondent's failure to follow medical recommendations prevented the detection of P's failure to thrive, were sufficient to support the court's neglect determination. See, e.g., *In re Amber B.*, Docket Nos. CP-16-016537-A, CP-16-6016538-A, 2017 WL 1239470, *6 (Conn. Super. February 8, 2017) (adjudicating child neglected on basis of, in

part, findings that child was diagnosed with failure to thrive due to malnutrition and that parent failed to follow through with medical recommendations); see also 2 Dept. of Children & Families, Policy Manual (effective April 12, 2023) § 22-3 ("[e]vidence of physical neglect includes . . . malnutrition . . . [or] action/ inaction resulting in the child's failure to thrive"). The respondent's arguments regarding his own behavior at Yale and P's progress after being discharged from Yale are of no moment to the court's adjudication determination, given that "[a] judgment of neglect is not directed at the respondent as a parent, but rather is directed at the condition of the [child]"; *In re Claudia F.*, supra, 93 Conn. App. 347; and that the court considered only "evidence of events preceding the filing of the petition," as it was required to do. Practice Book § 35a-7 (a).

The judgment is affirmed.

In this opinion the other judges concurred.